SHEA HOMES, INC. AND SUBSIDIARIES, ET AL.,[1] PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 29271–09, 1400–10,      Filed February 12, 2014.
1401–10.

Corporation C and partnerships S and V develop large, planned residential communities. They develop the land and construct homes and common improvements, including amenities. For the years at issue they reported income from their contracts for the sale of homes using the completed contract method of accounting. Under their interpretation of this method of accounting, their contracts are complete when they meet the use and 95% test pursuant to sec. 1.460–1(c)(3)(A), Income Tax Regs., and incur 95% of the costs of the development. They contend that final completion and acceptance pursuant to sec. 1.460–1(c)(3)(B), Income Tax Regs., does not occur (after excluding secondary items, if any, pursuant to sec. 1.460–1(c)(3)(B)(ii), Income Tax Regs.) until the last road is paved and the final bond is released. R seeks to place C, S, and V on his interpretation of the completed contract method. R contends that the subject matter of the contracts of C, S, and V consists only of the houses and the lots upon which the houses are built. Under R's interpretation, the contract for each home meets the final completion and acceptance test upon the close of escrow for the sale of each home. R also alleges that contracts entered into and closed within the same taxable year are not long-term contracts under I.R.C. sec. 460. *Held*: The subject matter of the contracts consists of the home and the larger development, including amenities and other common improvements. *Held*, *further*, C, S, and V are permitted to report income and losses from sales of homes in their planned developments using their interpretation of the completed contract method of accounting.

*Gerald A. Kafka*, *Rita A. Cavanagh*, *Chad D. Nardiello*, and *Sean M. Akins*, for petitioners.

*Melissa D. Lang*, *Allan E. Lang*, *David Rakonitz*, and *Nicholas D. Doukas*, for respondent.

WHERRY, *Judge*: These consolidated cases are before the Court on a petition for redetermination of deficiencies in income tax respondent determined for petitioner Shea Homes, Inc., and Subsidiaries' 2004 and 2005 tax years; a

---

[1] Cases of the following petitioners are consolidated herewith: Shea Homes, LP, J F Shea, LP, f.k.a. J F Shea, LLC, Tax Matters Partner, docket No. 1400–10; and Vistancia, LLC, Shea Homes Southwest, Inc., Tax Matters Partner, docket No. 1401–10.

petition for review of notices of final partnership administrative adjustment respondent issued for the 2004, 2005, and 2006 tax years of Shea Homes, LP; and a petition for review of notices of final partnership administrative adjustment respondent issued for the 2004 and 2005 tax years of Vistancia, LLC.

The ultimate issue for decision in these cases is whether Shea Homes, Inc., and Subsidiaries, Shea Homes, LP, and Vistancia, LLC, properly reported income and loss from the sale of homes in their planned developments using the completed contract method of accounting provided for in section 460.[2] The resolution of this issue turns on the determination of whether the home sale contracts include the development amenities or are limited to the house and the lot on which it sits.

### FINDINGS OF FACT

The parties' stipulation of facts and the accompanying exhibits are incorporated herein by this reference.

### *Petitioners*

Petitioner in docket No. 29271–09, Shea Homes, Inc. (SHI), and Subsidiaries, is an affiliated group of corporations with the common parent, SHI, organized under the laws of Delaware. At all relevant times SHI maintained its principal offices in Walnut, California. SHI used the accrual method as its overall method of accounting for the years at issue.

The partnership in docket No. 1400–10, Shea Homes, Limited Partnership (SHLP), is a limited partnership organized under the laws of California. J F Shea, LP, f.k.a. J F Shea, LLC (JFLP), is the tax matters partner of SHLP.[3] At all relevant times SHLP maintained its principal offices in Walnut,

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the taxable year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar unless otherwise noted.

[3] Effective April 1, 2005, JFLP was converted from a Delaware limited liability company, known as J F Shea, LLC, to its current form as a limited partnership.

California. SHLP used the accrual method as its overall method of accounting for the years at issue.

The partnership in docket No. 1401–10, Vistancia, LLC (Vistancia), is a limited liability company organized under the laws of Delaware. Shea Homes Southwest, Inc. (SHSI), is the tax matters partner of Vistancia. At all relevant times Vistancia maintained its principal offices in Scottsdale, Arizona. Vistancia used the accrual method as its overall method of accounting for the years at issue.

During the tax years at issue, SHI, SHLP, and Vistancia deferred revenue, costs of sales, and income from the contracted-for sales of homes that closed in escrow as follows:

|  | *2002* | *2003* | *2004* | *2005* | *2006* |
|---|---|---|---|---|---|
| SHI: |  |  |  |  |  |
| Revenue | --- | --- | $81,066,693 | $122,237,525 | --- |
| Cost of sales | --- | --- | 64,005,169 | 80,638,808 | --- |
| Income |  | $9,260,993 | 17,061,524 | 41,598,717 |  |
| Vistancia: |  |  |  |  |  |
| Revenue | --- | --- | 92,348,246 | 310,218,513 | --- |
| Cost of sales | --- | --- | 66,561,918 | 212,621,241 | --- |
| Income | --- | 8,835,716 | 25,786,328 | 97,597,272 | --- |
| SHLP: |  |  |  |  |  |
| Revenue | --- | 289,761,283 | 563,962,237 | 944,999,695 | $956,921,373 |
| Cost of sales | --- | 235,477,059 | 417,368,568 | 678,173,038 | 739,981,843 |
| Income[1] | $182,000 | 54,284,224 | 146,593,669 | 266,826,659 | 216,939,529 |

[1] In 2002, SHLP deferred $3,149,537 of income. It then determined that it had erroneously deferred $2,967,537 of that amount; and rather than file an amended return for 2002, it included the $2,967,537 in income on the 2003 return, which respondent accepted. The remaining $182,000 has apparently not yet been recognized. In addition, the parties stipulated that the income calculation for the 2006 year contains a rounding error. The income calculation for the 2005 year also likely contains a rounding error.

For the tax years at issue, SHI, SHLP, and Vistancia deferred some income from the sales of homes in the tax years the contracts for those sales closed in escrow and then recognized part of that income for Federal income tax purposes in following years as follows:

| | Year deferred | Deferred income | Year recognized | Amount recognized |
|---|---|---|---|---|
| SHI | 2003 | $9,260,993 | 2007 | $9,260,993 |
| | 2004 | 17,061,524 | 2007 | 17,061,524 |
| | 2005 | 41,598,717 | 2007 | 41,598,717 |
| Vistancia | 2003 | 8,835,716 | 2009 | 8,835,716 |
| | 2004 | 25,786,328 | 2009 | 25,786,328 |
| | 2005 | [1] 97,597,272 | 2009 | 97,597,272 |
| SHLP | 2002 | 3,149,537 | 2003 | 2,967,537 |
| | 2003 | [2] 54,466,226 | 2004 | 35,127,818 |
| | | | 2005 | 18,234,951 |
| | | | 2006 | 1,103,457 |
| | 2004 | [3] 146,593,669 | 2005 | 40,817,288 |
| | | | 2006 | 101,577,422 |
| | | | 2007 | 4,198,958 |
| | 2005 | 266,826,659 | 2006 | 60,556,813 |
| | | | 2007 | 48,350,567 |
| | | | 2008 | 33,374,188 |
| | | | 2009 | 21,215,992 |
| | 2006 | 216,939,529 | 2007 | 32,896,005 |
| | | | 2008 | 64,557,454 |
| | | | 2009 | 49,310,872 |
| | | | 2010 | 39,173,387 |

[1] Paragraph 42(c) of the parties' stipulation of facts reports the amount deferred as $97,597,272. Paragraph 79 of the stipulation reports the amount deferred as $97,597,273. This $1 discrepancy may be the result of rounding.

[2] This amount is derived from paragraph 79 of the parties' stipulation of facts and is in partial conflict with the $54,284,226 amount specified by paragraph 46(c) of the stipulation. This discrepancy is the apparent result of the $182,000 of deferred but not yet recognized income. *See supra* p. 62, table note 1.

[3] Paragraph 48(c) of the parties' stipulation of facts reports the amount deferred as $146,593,669. Paragraph 79 of the stipulation reports the amount deferred as $146,593,668. The $1 discrepancy may be the result of rounding.

*Deficiencies and Adjustments to Income*

Respondent determined the following deficiencies with respect to the Federal income tax of SHI:

| Year | Deficiency | Additional amended amount |
|---|---|---|
| 2004 | $5,971,533 | $3,241,348 |
| 2005 | 14,559,551 | --- |

The additional amended amount in the above table represents the amount respondent asserted in an amendment to his answer. Respondent asserts that this additional tax due amount is necessary under section 481(a) to prevent its permanent exclusion from Federal income taxation because of respondent's change in SHI's method of accounting.

Respondent also proposed the following adjustments to partnership income with respect to SHLP and Vistancia:

|  | Year | *Adjustments to partnership income items* | *Additional amended amounts* |
|---|---|---|---|
| SHLP | 2003 | $54,284,226 | $182,000 |
|  | 2004 | 111,465,850 | --- |
|  | 2005 | 266,826,659 | --- |
|  | 2006 | 216,939,529 | --- |
| Vistancia | 2004 | 25,786,328 | 8,835,716 |
|  | 2005 | 97,597,272 | --- |

Again, the additional amended amounts of taxable income are the amounts respondent alleges, by way of amended answer, are necessary under section 481(a). We also note that the partnership adjustments to the Federal taxable income of SHLP and Vistancia would have ultimately resulted in additional taxable income to the partners and may have resulted in significant additional tax due at the partner level.

Respondent calculated the above amounts by including in income amounts SHI, SHLP, and Vistancia deferred using the completed contract method of accounting as reported on schedules attached to their tax returns and as supported by their underlying work papers. These amounts do not reflect various computational, correlative adjustments. Petitioners, SHI, JFLP, and SHSI, timely petitioned this Court for review, and a trial was held in Washington, D.C.

*Company Background*

The Shea family has been in the home development business for more than 40 years. The home development business was operated through several entities, including SHI, SHLP, and Vistancia. During the years at issue the Shea family companies were one of the largest private homebuilders in the United States.

*Business Model*

SHI, SHLP, and Vistancia are builders/developers of planned communities, ranging in size from 100 homes to more than 1,000 homes in Colorado, California, and Arizona. During the years at issue they sold homes in 114 developments. For the purposes of these cases, the parties have

selected eight representative developments and have agreed that the Court's findings of fact based on documents and information from these sample developments will be controlling for all developments.[4]

The eight developments are each representative of a division. They are: (1) Trilogy at La Quinta; (2) Vistancia; (3) Parkside at Reunion; (4) Breakers at Pointe Marin; (5) Costa Azul; (6) Azure; (7) Country Lane; and (8) Sommerset at Morgan Hill. SHI, SHLP, and Vistancia conducted their home development business through divisions, organized on the basis of the geographic locations of their developments, except in the case of the Active Adults Division, which was based on the type of development. These divisions were as follows: (1) Active Adults Division; (2) Arizona Division; (3) Colorado Division; (4) Northern California Division; (5) Southern California Division; (6) San Diego Division; (7) Inland Empire Division; and (8) Sacramento Division.

SHI, SHLP, and Vistancia pride themselves on providing their customers with more than just the "bricks and sticks" of a home and emphasize the features and lifestyle of the community to potential buyers. For example, at the Reunion at Parkside community they advertised using the themes "live well, work well, play well" and "the pursuit of happiness".

SHI, SHLP, and Vistancia purchased land in various stages from completely raw to finished lots in developed communities. Their business involved the analysis and acquisition of land for development and the construction and marketing of homes and the design and/or construction of developments and homes on the land they acquired. The costs incurred in their home construction business included, by partial example: (1) acquisition of land; (2) financing; (3) municipal and other regulatory approvals of entitlements; (4) construction of infrastructure; (5) construction of amenities; (6) construction of homes; (7) marketing; (8) bonding; (9) site supervision and overhead; and (10) taxes. Their primary source of revenue from the home development business was from the sale of houses.

---

[4] The agreement is subject to an exception where it is necessary for the Court to make specific findings pertaining to the adjustments at issue, correlative adjustments, or any other computational findings.

We discuss *infra* the general process SHI, SHLP, and Vistancia used in their home development business. Much of the trial was dedicated to the details of the process, and we by no means list every single step. Our intention is not to discount those important steps not mentioned but to give a general idea of how the development process worked.

*Land Acquisition*

The initial step in the process is to acquire land on which to build the developments. Divisions of SHI, SHLP, and Vistancia are responsible for identifying parcels of land as candidates for development. After identification, the divisions evaluate multiple factors to ascertain whether that property constitutes a viable development opportunity. If a division determines that the land is viable for development, it prepares a Land Committee Report which summarizes the division's evaluation of the factors used to evaluate that parcel. The Land Committee Report is then sent to the Land Committee, comprising senior executives, including owners, for approval.

*Design of Developments*

The developments are typically designed by architects, engineers, and consultants engaged by SHI, SHLP, and Vistancia. The final design for the planned construction of the developments is presented on a map or plat called a Tract Map. The Tract Map is submitted for approval to the county or municipality in which the development will be located. SHI, SHLP, and Vistancia may be required, before or after formal submission, to revise the design of the development using input from the county or municipality.

*Performance Bonds*

SHI, SHLP, and Vistancia were required by State and municipal law to post bonds to secure their performance with respect to the completion of the common improvements in their developments.[5] The bonds required them to complete

---

[5] A surety bond is a promise to pay a party (the obligee) its loss up to a certain amount (the bond amount) if a second party (the obligor) fails to meet one or more obligations. A performance bond is a surety bond issued by an insurance company or bank (the surety) in favor of an obligee to guarantee satisfactory completion of a project by an obligor. In the real

the obligations specified therein before the bonds are exonerated. When performance bonds are required, they are posted before or concurrent with the approval by and recording with a governmental authority of a map or plat with respect to the development. The amount of a performance bond depended on the State and municipal law and the nature, extent, and anticipated costs of the common improvements. The costs are estimated by the obligee with the assistance of experts.

The obligor must purchase the bond by paying a premium to the surety. The surety prices the performance bond premium according to the risk associated with the obligor, the amount of the performance bond, and the term of the performance bond. If an obligor fails to fulfill the conditions of the performance bond, then the obligee may file a claim with the surety by sending the surety a letter detailing the failure of the obligor to perform under the conditions of the performance bond. Upon receiving the claim from an obligee, the surety forwards the claim to the obligor, who is required to manage the claim process, including all associated costs. If a surety is required to pay any of the bond amount to the obligee, the surety is entitled to recover the amount paid from the obligor and/or any third-party guarantor pursuant to indemnifications the obligor generally must enter into with respect to each surety.

The obligee must approve of the completion of the subject matter before the performance bond will be exonerated. Obtaining the approval of an obligee may involve negotiation between the parties as to whether the obligor has satisfied the terms of the performance bond. For example, municipalities may require an obligor to repave roads, fix curbs, install fire hydrants, or construct additional infrastructure common improvements before releasing the obligor. Homeowners associations may, as examples, require an obligor to repave nature trails, fix steps in common areas, or improve a clubhouse before releasing the obligor from a performance bond. The obligees identified in the performance bonds of SHI, SHLP, and Vistancia included the homeowners associations

estate development context, a performance bond is a surety bond issued by a surety in favor of an obligee to guarantee satisfactory completion of, among other things, common improvements with respect to a development constructed by an obligor (the developer).

formed with respect to their developments as well as the municipalities and States in which the developments are situated.

A performance bond may be accompanied by a bond guaranteeing payment of labor and material costs incurred in the development. These bonds are referred to as "labor and material bonds" or "payment bonds". They are surety bonds that supplement a performance bond for labor and material costs with respect to the conditions in the performance bond. The obligor of a labor and material bond may pay an additional premium to post the bond, or the premium may be included in the premium price of the associated performance bond. The amount, premium price, and process for exoneration of a labor and material bond or payment bond is similar to that used for a performance bond.

SHI, SHLP, and Vistancia posted performance bonds, labor and material bonds, and additional surety bonds for all eight representative developments. For Trilogy at La Quinta, SHI posted 28 bonds ranging in amount from $24,625 to $3,726,220 with premiums between $163 and $12,000.[6] The obligees on these bonds were the city of La Quinta, the County of Riverside, the California State government, and the Trilogy at La Quinta Maintenance Association. These bonds were exonerated between January 30, 2007, and December 21, 2010, with one bond for $2 million still outstanding as of the date of the trial in these cases.[7]

For the Parkside at Reunion development, SHLP posted six bonds ranging in amount from $23,592 to $3,300,000 with premiums between $464 and $13,200. The obligees were Commerce City and the County of Douglas.[8] Two bonds are

---

[6] These figures and the ones discussed below are from bond reports provided by petitioners and in evidence as stipulations and/or stipulated exhibits except in the case of Vistancia. The factual and documentary record concerning the bonds is spotty. The parties included original documents as to some of the bonds, but in other cases we rely solely on the bond reports. The parties did not provide a bond report for Vistancia, but they did provide a number of bond documents.

[7] Likewise, the bonds noted *infra* as outstanding were outstanding as of the date of the trial.

[8] The bond for the benefit of Douglas County is confusing to the Court as it is presented as used in connection with the Parkside at Reunion development, but the Exhibit 187–P listing references Highlands Ranch. Parkside is in Adams County, whereas Highlands Ranch is in Douglas

still outstanding. The other four bonds were exonerated between October 5, 2006, and March 19, 2009.

For Breakers at Pointe Marin, SHLP posted 23 bonds ranging in amounts from $1,677 to $1,708,400. The bond report does not list the premiums paid, but other exhibits reflect a $100 premium per bond for the other earlier Breakers at Pointe Marin surety bonds of $1,677, $1,845, $2,348, $2,012, $3,689, and $2,348. The obligee on these surety bonds was Pointe Marin Association, the development's homeowners association. Exhibits also show performance bonds ranging from $58,635 to $82,151 with premiums ranging from $150 to $410. The obligee of these bonds was also the homeowners association. Obligees for the remaining bonds listed on the bond report were Novato Sanitary District, North Marin Water District, and the city of Novato.

As to Costa Azul, SHLP posted five bonds. SHLP posted a performance bond in the amount of $500,000, with a premium of $2,500. The State of California was the obligee on this bond. SHLP also posted bonds in the amounts of $10,950, $9,816, and $7,164 with premiums of $110, $100, and a premium amount not disclosed by the trial record, respectively. The fifth bond was for $172,000. The record again does not reflect the premium, but the obligee was the County of Orange. These bonds were exonerated as early as January 9, 2009, and as late as July 19, 2010.

For Azure, SHLP posted 22 bonds. These bonds included a $300,000 bond with a $1,050 premium. The obligee on this bond was the State of California. Of the remaining bonds, at least two were surety bonds for $20,824 and $1,885 issued with the development's San Elijo Hills Community Homeowners Association as the obligee. The premiums for these bonds were $104 and $100, respectively. The remaining 19 bonds ranged in amount from $1,105 to $98,500. The exoneration dates on all bonds ranged from January 19, 2005, to July 1, 2008.

With respect to Country Lane, SHLP posted only one bond. This bond was for $330,657, the obligee was the State of Arizona, and the exoneration date was November 1, 2004.

---

County with the County of Arapahoe and/or the City and County of Denver in between. The explanation may involve utilities such as water or sewage treatment or an error in the exhibit.

As for Sommerset at Morgan Hill, the bond report shows that SHLP posted five bonds. According to the report, these bonds ranged in amount from $52,750 to $570,800. The obligee on four of these bonds was the County of Riverside, and the obligee on the fifth bond was the County of San Bernardino. The report reflects that three of these bonds were exonerated on December 7, 2007. The parties also included an unsigned copy of a surety bond not included in the bond report reflecting a sixth bond for $300,000 with a premium of $1,050 and the State of California as the obligee.

Finally, for Vistancia, the parties introduced evidence of three performance bonds. These bonds were for $134,358, $346,971, and $235,441 with premiums of $672, $1,735, and $1,177, respectively. The obligee on the $134,358 bond was the city of Peoria, Maricopa County, Arizona. The obligee on the other two was the development's homeowners association.

*Budgeting*

SHI's, SHLP's, and Vistancia's operating divisions prepared budgets for the direct and indirect costs relating to the construction of developments. They prepared the budgets on a development-wide basis by compiling a budget file, referred to as a Tract-Property Investment Evaluator file (Tract-PIE file).[9] They used this tool to monitor the anticipated and actual development costs and the projected and actual revenue from the sale of homes in the development. They also updated the development's Tract-PIE file on an annual, semi-annual, or quarterly basis depending on the needs of the particular development.

The Tract-PIE data inputs included: incurred costs and revenue received with respect to the development (actuals); job cost reports containing estimated unincurred costs (job cost);[10] sales and marketing forecasts (sales and marketing); estimated construction costs per home model (direct construc-

---

[9] Tract-PIE is a commercial software tool used to forecast and monitor the costs and revenue associated with constructing a development.

[10] The job cost data input is the estimated, non-home-specific construction costs, including estimated costs for the purchase of land, design of the development, construction of infrastructure and amenity common improvements, labor, fees, and property taxes.

tion template); [11] estimated revenue from the sales of homes (sale price revenue); and inflation and appreciation assumptions (inflation/appreciation). Respondent does not challenge the accuracy of the construction budgets.

Estimates of revenue from home sales involved projections of the average price of sold homes, the sales absorption rate, the construction cycle, and price appreciation, among other variables. SHI, SHLP, and Vistancia came up with their anticipated revenue starting with a projection of the number of houses they intended to build in a development and how many different floor plans they intended to offer. The divisions estimated, using experience and sometimes the help of outside consultants, a sale price for each floor plan.

The prices per floor plan were exclusive of any discount or premium for views, lot size, or other aesthetic draws or drawbacks. Rather SHI, SHLP, and Vistancia estimated each premium and discount as a development-wide number; then they divided that number by the projected number of units to arrive at an average discount and premium per unit. SHI, SHLP, and Vistancia used the average price per home, plus the premium and less the discount, to come up with a gross revenue figure and, after considering forecasted sales pace, added on additional revenue for expected future price increases.

Similarly, SHI, SHLP, and Vistancia generally estimated costs on a development-wide basis, although some costs are estimated on a per-unit basis and extrapolated to a development-wide basis (e.g., their initial pro forma for Azure estimated a permitting cost of $3,000 per house). But they could roughly estimate costs on an average per-unit basis by dividing the total amount of estimated costs by the estimated number of homes to be sold.

The Land Committee Report discussed *supra* included an estimated budget of that development's revenue and expenses. SHI, SHLP, and Vistancia also summarized esti-

---

[11] The direct construction template consists of the estimated costs on a per-square-foot basis to construct each home model sold in that development.

mated costs and revenues on a so-called napkin, [12] which included information from the Land Committee. On these reports "direct expenses" represented the actual "bricks and sticks" costs of home construction in the development. The parties provided Land Committee Reports and napkins for only four of the developments.

*Construction of Developments*

SHI, SHLP, and Vistancia constructed their developments in a sequence of stages consisting of: grading land; initial construction of amenity and infrastructure common improvements; construction of homes; and construction and finalization of any remaining common improvements. The amount of time it took to grade the land and initially construct the amenities and common infrastructure varied with the size, surface and subsurface condition, and nature of the development. The grading process was particularly subject to risk because often soil conditions under the surface differ from what was originally anticipated. While SHI, SHLP, and Vistancia assigned a cost and a time line to the initial construction phase, that time and cost would vary with conditions. It took approximately three to five months to construct a single-family detached home and approximately six to eight months to construct multifamily attached homes. For large developments, they could perform the construction stages in phases.

*Homeowners Associations*

Each development had at least one homeowners association. These associations could include homeowners associations, condominium associations, maintenance associations, master associations, and community associations. The structure, activities, and obligations of an association were governed by, inter alia, (i) the articles of incorporation, (ii) bylaws, and (iii) covenants, conditions, and restrictions documents with respect to those associations.

---

[12] The napkin is so called because it is a quick pro forma estimate, as if one were quickly evaluating a project on a napkin.

*Pricing of Homes*

SHI, SHLP, and Vistancia charged a single price for their homes. This is the "total purchase price". They did not charge separate prices for the home, the lot, improvements to the lot, infrastructure and amenity common improvements, financing, fees, property taxes, labor and supervision, architectural and environmental design, bonding, or any other costs. They could increase the price of a home by charging a lot/homesite or elevation premium. Such a premium was an additional charge for a home on a lot with preferred qualities or a home with aesthetic, architectural, or design upgrades to the exterior. SHI, SHLP, and Vistancia could also increase the price of a home for additional options or upgrades to the home. All of these charges were included in the total price set forth in the purchase and sale agreement.

*Marketing*

SHI, SHLP, and Vistancia used multiple forms of marketing including: print (magazines, newspapers, flyers, and pamphlets); radio; television; the Internet; billboards; and word of mouth. For a prospective buyer visiting a development, their on-site marketing efforts included: driving tours; guided walking tours of a development's amenities; models of amenities that remain under construction; movies; and walkthroughs of model homes presented in a community style.

SHI, SHLP, and Vistancia started their marketing process well in advance of the opening of the community. For example, the Active Adults Division developed a preselling process called tsunami. This process included focus groups, lead-generating mailers, and design shows. These design shows, also known as charrettes, and focus groups invited potential consumers to contribute to the design of the community. The consumers would, before the first home was sold, get a sense of ownership in the community. Often participants in this presale process would be the first buyers once the development was opened for sale.

After the presale process, the community was generally opened for sales. At this point SHI, SHLP, and Vistancia intended to have finished constructing the community center and the model gallery. They thereafter continued to advertise

using the tools discussed above. For example, with respect to Parkside at Reunion they established a Web site, reunionco.com; ran newspaper ads; and used billboards. Generally, this marketing process was geared towards selling the community and lifestyle, not just the homes.

At Vistancia, the "marketing trail" began when consumers first drove into the community. Vistancia purposefully designed the development so that the consumer, to get to the tour center and sales office, had to drive past all of the major amenities. They designed the grading of the land to make sure the water feature for the 18th hole of the golf course was visible for the entire drive from the gatehouse. They also oriented waterfalls and other aesthetics towards the consumer to maximize visibility on the drive in. Essentially, prospective purchasers' views during their initial drive into a community was intended to be a silent sales corridor.

The sales staff at Vistancia greeted the consumers by their names, which had been radioed from the gatehouse to the tour center. At the tour center, the staff showed the consumers a short video, which emphasized the development's friendships, lifestyle, and community. The potential buyers then toured the clubhouse and the golf club and all of the various amenities. This tour could take between three and five hours. Customers then returned to the tour center, where Vistancia's sales staff explained the benefits of living in the community. They began their explanation of the benefits at the macro geographical area and the proximity to La Quinta and then moved on to the micro level of the Vistancia community. Finally, the potential customers entered the model gallery, which consisted of several model homes as well as cafes and an amphitheater. Vistancia showed the homes only at the end because the marketing approach and product encompassed much more than the home, and it tried to showcase features and amenities to sell "the dream" to set up the sale of the home.

### *Financial Data Tracking*

SHI, SHLP, and Vistancia used Tract-PIE software to record, account for, and summarize incurred and budgeted data with respect to each development. The information Tract-PIE kept on file for each development included cashflow receipts and disbursements, income statement, bal-

ance sheet, internal rate of return, financing data, book interest allocations, inflation projections, total units, units closed, and projected unit closings for both incurred and budgeted data during the duration of the development. The Tract-PIE software tracked costs by both indirect and direct costs. SHI, SHLP, and Vistancia updated the budgeted costs quarterly with information provided by the divisions.

The software allowed a breakdown of direct costs into a number of categories. The land and acquisitions category represented costs to purchase the development land. The profit and participation agreements category represented agreements in which the seller of the development land had the opportunity to share in the profits of the development. The forward planning category represented costs associated with civil engineering, design, and architecture for the development. Direct construction costs were the costs incurred in the vertical construction of the homes, and option deposits and option costs reflected costs incurred with respect to upgrades buyers could select. Model upgrade costs were costs with respect to the model homes. Commitment fees were costs associated with financing activities. Finally, the sales tax category represented the Arizona sales tax that jurisdiction imposed on the sale of a home.

The indirect cost categories included property tax payments, site development/land development/common area costs for infrastructure, and amenities within a development. The category for amenities and golf reflected costs for a development's golf course(s). The permits and fees category recorded payments to municipal and State jurisdictions to permit constructing of the development. A property tax payments category reflected payments made for tax on property not yet conveyed to third parties, either through sale or through transfer to the homeowners associations or municipalities.

There were also indirect cost categories for rebates/credits, indirect construction costs, management fees, and miscellaneous costs. Petitioners received rebates and credits from their materials suppliers if they met certain purchase quotas. Indirect construction costs were costs associated with supervision, cleanup, architectural review, and other similar activities with respect to construction. Management fees were fees paid in developments being built as a joint venture.

Miscellaneous costs consisted of any other indirect cost not covered by the other categories.

The Tract-PIE files allowed SHI, SHLP, and Vistancia to compare the indirect costs to the direct costs. For example, exhibits and testimony show that for the 2005 tax year, the indirect costs of Parkside at Reunion were approximately 27% or more of the total budgeted costs. Similar or even larger percentages applied to other developments such as Vistancia and Trilogy at La Quinta, where SHI, SHLP, or Vistancia was responsible for converting raw land into a development rather than purchasing and developing just a portion of another developer's project, where some indirect costs had already been incurred and were included in land costs.

To monitor operational performance and income tax compliance, SHI, SHLP, and Vistancia divided the total incurred direct and indirect costs by the total budgeted direct and indirect costs. Their tax department made relevant adjustments to reflect what it considered to be the requirements of section 460, such as capitalization computations and tax interest analyses. If the incurred costs were equal to or greater than 95% of the budgeted costs, then they reported income for that tax year from homes that had closed in escrow up to that date. If the incurred costs did not exceed 95%, then they deferred any income from homes that closed in escrow that year.

For Federal income tax purposes during 2002 and 2003, SHLP compared the total number of homes closed in a development to the number projected to be closed by the end of the development. SHI computed the 95% test by comparing the development's total incurred direct and indirect costs to the development's total budgeted direct and indirect costs. For the 2003 and 2004 tax years, Vistancia did not mathematically determine whether either the 95% test or the final completion and acceptance test had been met, the reason being that Vistancia estimated there were no circumstances under which the 95% test would be satisfied because such a small portion of the homes in the development had been completed.

For all tax years after 2003, except as just noted, SHI, SHLP, and Vistancia used the Tract-PIE software and related documentation to compare the development's

incurred direct and indirect costs to the development's total budgeted direct and indirect costs for the purposes of determining whether to report income for Federal income tax purposes under their interpretation of the completed contract method of accounting.

*Description of the Eight Representative Developments*

*Trilogy at La Quinta*

The Trilogy at La Quinta development was a gated community with security and landscaping features located in Riverside County, within the city limits of La Quinta, California. The Trilogy development was constructed in eight phases, with 1,238 total lots and residences situated on approximately 536 acres. Construction began in or about July 2000. The Trilogy development included a 30,000-square-foot clubhouse with a ballroom, a center for higher learning, a studio for creative arts, a cafe, a kitchen, a catering kitchen, a grand living room, offices, mail offices, locker rooms, studios, an indoor pool, an outdoor pool, cabanas, an indoor running track, a fitness center, a meditation garden, and a spa. It also had outdoor walking, running and bike paths, tennis courts, and outdoor recreation areas.

*Vistancia*

The Vistancia development was in Peoria, Arizona, and included three subdivisions: Vistancia Village, Blackstone, and Trilogy. As originally designed, the plan was to include 18 phases, situated on approximately 7,100 acres. Construction of the Vistancia development began in or about January 2002. The Vistancia development included a 3.5-mile trail system, a restaurant, a spa, pools, a basketball gymnasium, a multipurpose building, a tennis court, parks, open spaces for wildlife, playgrounds, and a country club.

*Parkside at Reunion*

The Parkside development was in Commerce City, Colorado. It was a subdivision of a larger development named Reunion. Construction of the Reunion development began in or about May 2001 and continued through December 2011 in four phases, with 1,875 total lots and 1,425 total residences on approximately 980 acres. The Reunion development

included a 21,000-square-foot recreation center featuring an indoor gymnasium, a fitness center, aerobics, meeting, and locker rooms, an outdoor pool with interactive water features, a 52-acre central park that includes multiuse athletic fields, trails, playgrounds, picnic facilities, and an amphitheater, 10 miles of walking, running and biking trails, 8 acres of lakes, 150 acres of parks, and 170 acres of open space.

### Breakers at Pointe Marin

The Breakers at Pointe Marin development was in Novato, California. It was a subdivision of a larger development called Pointe Marin. The homes in the Breakers at Pointe Marin were constructed in 10 phases, with 106 total lots situated on approximately 25 acres, beginning in or about May 2004. The Pointe Marin development included walking, running, and bike paths as well as open spaces for wildlife.

### Costa Azul

The Costa Azul development was a gated community with security features located in Newport Beach, California. This development was a subdivision of a larger development called Pacific Ridge. It consisted of 42 total lots, situated on approximately 22 acres. The homes in Costa Azul were constructed in eight phases beginning in or about April 2004. The development included a recreation center, tot lots, a swimming pool, a spa, locker rooms, a park, and walking, running, and biking trails and paths, including open spaces for wildlife.

### Azure

The Azure development was in San Marcos, California. It was a subdivision of a larger development called San Elijo Hills. The homes in the Azure development were constructed in four phases beginning in or about November 2003. It contained 92 total lots, situated on approximately 30 acres. The Azure development included a park, a pet run area, a skating area, a swimming pool, and a daycare facility.

### Country Lane

The Country Lane development was in Gilbert, Arizona. It was a subdivision of a development called Neely Commons. The homes in the Country Lane development were con-

structed in a single phase, with 193 total lots, situated on approximately 25 acres, beginning in or about July 2002. The Country Lane development included a park, landscaped pedestrian areas, a soccer field, a tot lot, ramadas, and a half-court basketball facility.

### *Sommerset at Morgan Hill*

The Sommerset at Morgan Hill development was in Temecula, California. It was a subdivision of a larger development called Morgan Hill. The homes in the Sommerset at Morgan Hill development were constructed beginning in or about March 2004 in seven phases with 70 total lots, situated on approximately 17 acres. The development included a community center, a clubhouse, tennis courts, swimming pools, spas, a tot lot, and walking, running, and biking paths.

### *Documentation*

### *Purchase and Sale Agreement*

SHI, SHLP, and Vistancia entered into sales contracts with prospective homebuyers. The purchase and sale agreement identified the buyer and the seller. It provided that the buyer agreed to purchase the property and the seller agreed to sell the property. When the buyer and the seller entered into a contract for the purchase of a home, the buyer had to remit an earnest money deposit. Once the contract had been executed the parties were obligated to perform. Before the buyer and seller could close escrow on a home, SHI, SHLP, and Vistancia were required to either construct all common improvement areas for the development (or phase) or post a bond as discussed *supra*. Therefore, in some instances the buyers were required to pay the full contract price before all of the common improvements and amenities promised for that development were completed.

Before escrow could close, SHI, SHLP, and Vistancia had to obtain a certificate of occupancy from the local government having jurisdiction over the home. Once the funds and the closing documents were in escrow, and in proper order and duly executed, the deed transferring the property to the buyer was recorded. An average of four to six months passed between the time the buyer and the seller entered into the

contract for the purchase of a home and the time when escrow closed. At closing, SHI, SHLP, and Vistancia had expended all costs required to construct the dwelling unit and the improvements to the lot on which it sat.

For the two representative developments in Arizona, Country Lane and Vistancia, the purchase contracts and the closing and escrow instructions included a statement disclosing the purchaser's right to receive and read a copy of the development's public report before signing the purchase agreement. The documents also included an initialed and signed acknowledgment, by the purchaser(s), of the receipt of a copy of the development's public report and of the opportunity to read it. The purchaser(s) also signed a receipt documenting that he/she acknowledged the public report, identified by a registration number and a date, and the information contained therein, which constituted a part of the purchase contract and closing and escrow instruction documentation.

For the five representative developments in California, Trilogy at La Quinta, Breakers at Pointe Marin, Costa Azul, Azure, and Sommerset at Morgan Hill, the purchase contracts and the closing and escrow instructions included California DRE Form RE614E, Receipt For Public Report Or California Permit, as evidence of the purchasers' receipt of the public report. This document stated:

> The Laws and Regulations of the Real Estate Commissioner require that you as a prospective purchaser * * * be afforded an opportunity to read the public report * * * for this subdivision before you make any written offer to purchase * * * a subdivision interest or before any money or other consideration toward purchase * * * of a subdivision interest is accepted from you.

The document further admonished prospective purchasers: "DO NOT SIGN THIS RECEIPT UNTIL YOU HAVE RECEIVED A COPY OF THE PUBLIC REPORT * * * AND HAVE READ IT." The document further required the signature(s) of the purchaser(s) confirming that he/she had read the public report, identified by registration number and date of issuance.

*Public Reports*

The purpose of a public report is to disclose to a home-buyer the rights and obligations imposed on or granted to the homebuyer as well as the seller with respect to a certain development.

*Arizona*

In Arizona the public report stated that the Department of Real Estate requires the developer to provide each purchaser with a copy of the public report and to obtain a signed receipt. It noted that the purchase contract is rescindable by the purchaser if the developer fails to obtain a public report before offering the subdivided lots for sale or if the developer fails to provide the purchaser with a copy of the report. The public report also noted the designation of the portions of the development that are common areas, specifically stating for one of the developments that the portions that are common areas "ARE TO BE CONVEYED TO THE COUNTY LANE COMMUNITY ASSOCIATION, IN EACH CASE FOR THE USE AND ENJOYMENT OF SUCH ASSOCIATION AS MORE FULLY SET FORTH IN THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS APPLICABLE TO SUCH ASSOCIATION".

The public reports for the two Arizona developments also cited the locations of the development maps, which identified the developments' common areas and improvements. The reports indicated the dates the developer anticipated completion of the common area improvements and facilities as well as providing assurances that the common improvements would be completed. Specifically, for example, the Country Lane development reports stated: "Escrows will not close until the Town of Gilbert has issued its Occupancy Clearance and all Subdivision improvements have been completed. A bond has been secured to assure the completion of the landscaping in the common area tracts. A bond for the completion of the additional landscaped pedestrian areas has been secured as assurance of their completion."

*California*

The public reports for the five developments in California stated that a purchaser(s) must acknowledge by signature

that he/she has received and read the public report for the development. The public reports stated, under a section titled "INTEREST TO BE CONVEYED", that each purchaser would receive fee title to a lot, membership in the home-owners association, and rights to use the common areas. The public reports also provided the developers' estimate of when common areas and improvements would be completed and stated that escrows would not close until either the common areas and facilities had been completed or bonds had been posted. However, four of the five reports also stated that there was no assurance the project would be completed or developed as proposed. Therefore, while the public reports warned the purchasers that there was no assurance that the project would be completed or developed as proposed, the phase of the development that the public report discussed was assured. SHI, SHLP, and Vistancia had to complete or post bonds ensuring completion of common improvements.

The public reports for the five California developments included a provision that before closing escrow, the developer was required to provide the purchaser with copies of the homeowners association articles of incorporation, including bylaws and covenants, conditions, and restrictions and that those documents should be read and included numerous provisions that substantially affected the purchasers' rights.

*Covenants, Conditions, and Restrictions*

The developments were governed by a declaration of covenants, conditions, and restrictions (CC&Rs). The CC&Rs were reviewed and approved by the State's department of real estate and local government agencies where that development was located and, in California and Colorado, were recorded. [13]

SHI, SHLP, and Vistancia provided each purchaser, at or before execution of a purchase agreement, with a copy of the declaration of CC&Rs in connection with the sales of homes in that development. These CC&Rs provided rights and restrictions with respect to the use and enjoyment of the purchased property. CC&Rs applied to the purchaser of property

---

[13] California and Colorado require a developer to file the CC&Rs with the clerk and recorder's office of the county in which the development was located.

within the development and to all future interest holders of property in the development. The CC&Rs included a legal description of the land subject to the CC&Rs, including both residential lots and common areas, and all of the property within the eight representative developments was held or conveyed subject to the terms of their respective CC&Rs. The purchasers of each home affirmed receipt of a copy of the CC&Rs by signing acknowledgments in the purchase and sale agreement or other related documents.

The CC&Rs provided the authority for the homeowners association to administer the CC&Rs and manage the development, including the authority to assess members and to own and maintain common improvements. Under the CC&Rs each homeowner in the development automatically became a member of the development's homeowners association and remained a member until he/she no longer held an ownership interest. The CC&Rs also authorized the respective homeowners associations to enforce collection action, including filing a lien and the commencement of a foreclosure action against any member that failed to satisfy an assessment. Both the homeowners associations and their individual members could enforce the CC&Rs.

For seven of the eight representative developments, the CC&Rs required SHI, SHLP, and Vistancia to transfer title to the common improvements to the developments' respective homeowners associations. For Parkside at Reunion, the common improvements were not conveyed to the homeowners association. Rather, the purchasers obtained a tenancy in common interest with all other development owners in these common improvements. The CC&Rs specified this ownership interest.

*Maps and Plats*

The public reports referred to the tract maps on file with the local government. These tract maps represented the final design for the planned development. Generally, SHI, SHLP, and Vistancia prepared tentative versions of these maps first. The tentative map dictated grading, lots, streets, parks, easements, and other similar features. Often the local government required some modifications and also attached conditions and requirements before it would accept a tract map.

Approval of a final tract map often resulted in additional conditions, such as requiring the developer to pay for grading, curbs, gutters, sidewalk paving, streets, and utilities, which met that jurisdiction's standards. The local governments did not just restrict conditions to the areas within the developments themselves. They could also condition the approval upon widening arterial roads at the boundaries of the developments, the building of schools, or installing offsite traffic lights. SHI, SHLP, and Vistancia could negotiate with respect to the scope, standards, and nature of the conditions to some degree, but the governmental authority retained the ultimate approval control over the maps. During the entitlement process, SHI, SHLP, and Vistancia often employed consultants. The governments also sometimes employed consultants in this process, and on occasion, SHI, SHLP, and Vistancia would cover the cost of these government consultants.

SHI, SHLP, and Vistancia would also enter into agreements with the local governmental agencies. SHI, SHLP, and Vistancia had two options. They could build everything required by the map, or alternatively, they could enter into a subdivision improvement agreement with the governmental authority. These agreements required them to post bonds for improvements not yet built. If all of these steps were satisfactorily completed, then the governmental authority was obligated to record the map.

OPINION

I. *Burden of Proof*

Generally, the Commissioner's determination of a taxpayer's liability for an income tax deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is improper. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). But if a taxpayer's method of accounting does not clearly reflect income, section 446(b) allows the Commissioner to change the taxpayer's method of accounting to one that does clearly reflect income. The Commissioner is granted broad discretion in determining whether an accounting method clearly reflects income, and that determination is entitled to more than the usual presumption of correctness. *Commissioner v. Hansen*, 360

U.S. 446, 467 (1959); *RECO Indus., Inc. v. Commissioner*, 83 T.C. 912, 920 (1984). The question of whether a particular accounting method clearly reflects income is a *factual* question. *Sam W. Emerson Co. v. Commissioner*, 37 T.C. 1063, 1067 (1962).

To prevail, the taxpayer must establish that the Commissioner abused his discretion in changing the method of accounting. *Prabel v. Commissioner*, 91 T.C. 1101, 1112 (1988), *aff'd*, 882 F.2d 820 (3d Cir. 1989). But the Commissioner may not change a taxpayer's method of accounting from an incorrect method to another incorrect method. *Id.* Nor may the Commissioner change a taxpayer's method of accounting "[w]here a taxpayer's method of accounting is clearly an acceptable method" and clearly reflects income. *Id.*

On brief petitioners renewed pretrial motions to shift the burden of proof to respondent. Petitioners contend that respondent's determinations are excessive and arbitrary and thus justify the burden shift. *See Estate of Mitchell v. Commissioner*, 250 F.3d 696, 702 (9th Cir. 2001), *aff'g in part, vacating in part and remanding* T.C. Memo. 1997–461. Specifically, petitioners allege, citing *Golden State Litho v. Commissioner*, T.C. Memo. 1998–184, that respondent has not identified the correct method of accounting on which he seeks to place SHI, SHLP, and Vistancia. We disagree. Respondent is seeking to place SHI, SHLP, and Vistancia on his interpretation of the completed contract method, discussed in more detail below. Thus the burden of proof does not shift in these cases.

II. *Legal Framework*

A. *Long-Term Contracts Generally*

Section 460 governs how taxpayers report income from long-term contracts. It generally provides that taxpayers who receive income from long-term contracts must account for that income through the percentage of completion method. Sec. 460(a). This method essentially requires a taxpayer to recognize income and expenses throughout the duration of a contract. Sec. 460(b); *Tutor-Saliba Corp. v. Commissioner*, 115 T.C. 1, 4 (2000). But, by an amendment, the statute excepts, inter alia, home construction contracts. Sec. 460(e)(1)(A), (6)(A) (as amended by the Technical and Mis-

cellaneous Revenue Act of 1988, Pub. L. No. 100–647, sec. 5041(b)(1), 102 Stat. at 3673).

Section 460(f)(1) defines a long-term contract as "any contract for the manufacture, building, installation, or construction of property if such contract is not completed within the taxable year in which such contract is entered into." The statute does not define completion, which is to be determined on a contract-by-contract basis, sec. 1.460–1(f), Income Tax Regs., but the regulations provide that a contract is completed when it first meets one of two tests, sec. 1.460–1(c)(3)(i), Income Tax Regs. These tests are commonly known as the use and 95% completion test, and the final completion and acceptance test.

Under the first test, the contract is completed upon "[u]se of the subject matter of the contract by the customer for its intended purpose (other than for testing) and at least 95 percent of the total allocable contract costs attributable to the subject matter have been incurred by the taxpayer". Sec. 1.460–1(c)(3)(i)(A), Income Tax Regs. Under the second test, the contract is completed upon "[f]inal completion and acceptance of the subject matter of the contract." Sec. 1.460–1(c)(3)(i)(B), Income Tax Regs. As for this latter test, "to determine whether final completion and acceptance of the subject matter of a contract have occurred, a taxpayer must consider all relevant facts and circumstances." Sec. 1.460–1(c)(3)(iv), Income Tax Regs.

A further wrinkle to determining when a taxpayer completes a contract is the role of secondary items. Taxpayers are to apply the tests to determine when a contract is completed under the completed contract method "without regard to whether one or more secondary items have been used or finally completed and accepted." Sec. 1.460–1(c)(3)(ii), Income Tax Regs. In applying the 95% completion test, taxpayers "must separate the portion of the gross contract price and the allocable contract costs attributable to the incomplete secondary item(s) from the completed contract". *Id.*

B. *Home Construction Contracts*

A taxpayer may account for income from home construction contracts under the completed contract method. Sec. 460(e). That is because section 460(e) provides that the percentage

of completion method will not apply to "any home construction contract". [14] A "home construction contract" is

> any construction contract if 80 percent of the estimated total contract costs (as of the close of the taxable year in which the contract was entered into) are reasonably expected to be attributable to activities referred to in paragraph (4) with respect to—
> (i) dwelling units * * * contained in buildings containing 4 or fewer dwelling units * * *, and
> (ii) improvements to real property directly related to such dwelling units and located on the site of such dwelling units.
>     [Sec. 460(e)(6)(A).]

The "activities referred to in paragraph (4)" are "building, construction, reconstruction, or rehabilitation of, or the installation of any integral component to, or improvements of, real property." Sec. 460(e)(4).

As the statute is written and depending on the meaning of the word "site", taxpayers such as SHI, SHLP, and Vistancia can have trouble meeting the 80% requirement of section 460(e)(6)(A). This occurs because a significant portion of the contract costs may be attributable to items not "located on the site of such dwelling units", such as development infrastructure. The regulations, however, instruct a taxpayer to "include[] in the cost of the dwelling units their allocable share of the cost that the taxpayer reasonably expects to incur for any common improvements (e.g., sewers, roads, clubhouses) that benefit the dwelling units and that the taxpayer is contractually obligated, or required by law, to construct within the tract or tracts of land that contain the dwelling units." Sec. 1.460–3(b)(2)(iii), Income Tax Regs.

Thus, at least for the purpose of determining whether the contract qualifies as a home construction contract under section 460(e), the taxpayer includes, for the 80% test, costs attributable to common improvements in the manner dictated by the regulations. Petitioners and respondent disagree, however, as to whether this regulation affects the tests in section 1.460–1(c)(3)(A) and (B), Income Tax Regs.,

---

[14] Sec. 460(e) also contains an exception for certain other construction contracts provided that the taxpayer meets a gross receipts test and anticipates the contract will be completed within two years of contract commencement. Sec. 460(e)(1)(B). This section also gives a more generous percentage of completion method of accounting for residential construction contracts which are not home construction contracts. Sec. 460(e)(5).

that determine when the taxpayer completes the contract for the purposes of deciding whether it is a long-term contract.

III. *Analysis*

We must decide whether SHI, SHLP, and Vistancia properly reported their income from the sales of homes in their developments using the completed contract method. Respondent contends that only the contracts that closed in tax years different from the taxable years they were entered into qualify as long-term contracts. Under respondent's interpretation of the completed contract method, SHI, SHLP, and Vistancia must report income from these long-term contracts for the years in which the contracts closed in escrow. Respondent takes this position because, in his view, the subject matter of the contract is the home and the lot upon which it sits. Consequently, each contract is completed, within the meaning of section 460, in the year in which escrow closes. That year is when respondent contends final completion and acceptance occurs.[15] For the other contracts, respondent would require SHI, SHLP, and Vistancia to account for the income under their normal method of accounting.

Petitioners are of the opinion that the subject matter of the contracts is broader and encompasses the entire development or, in some instances of larger developments, the development phase of which the home is a part. In support, petitioners contend that a contract comprises all documents provided to the buyer, any documents expressly referenced therein or incorporated therein by law, and easements, restrictions, and other documents recorded as encumbrances on a home purchaser's title. Petitioners assert that these documents collectively set forth the rights and obligations of the buyer and seller. Therefore, they contend that, other

---

[15] It has been 25 years since sec. 460(e)(1)(A) and (6)(A) was enacted by the Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100–647, sec. 5041, 102 Stat. at 3673, and apparently development builders, such as SHI, SHLP, and Vistancia, may have used this method since 1988. The earliest tax year at issue in these cases is 2003. That delay in enforcement is immaterial to our consideration as the Commissioner is not bound by his failure to enforce the law in an earlier year. *United States v. Woods*, 571 U.S. ___, ___, 134 S. Ct. 557, 567 n.5 (2013); *Coors v. Commissioner*, 60 T.C. 368, 395 (1973), *aff'd*, 519 F.2d 1280 (10th Cir. 1975).

than secondary items if any, the final completion and acceptance does not occur until, as to the phase or the development, the final road is paved and the final bond is released. Under their interpretation, the use and 95% completion test is met first when SHI, SHLP, and Vistancia incur 95% of the phase's or development's costs. Petitioners contend that because the 80% test for a home construction contract includes the allocable share of the costs of common improvements, the 95% test also must include these costs.

Respondent also urges an alternative theory. According to this theory, if we hold that the subject matter of the contracts is broader than the house and the lot, we must apply the 95% completion test without regard to the costs attributable to common improvements because they are secondary items. Petitioners, however, contend that these common improvements are part of the primary subject matter of the contract, not secondary items, and that they may include such allocable costs in applying the 95% test.

The initial question is what documents are part of the contracts. Under respondent's interpretation, the subject matter of the contracts is the lot and the house which the buyer(s) purchase. To support this contention, respondent points to the purchase and sale agreement as being the sole contract document. He urges us to find that State law and the wording of the contract necessarily restrict the contract to only this document. Petitioners, however, contend that the scope of the contracts exceeds the mere "bricks and sticks" and encompasses the development as a whole. In this vein, petitioners assert that, for the purposes of section 460, the contract consists of the purchase and sale agreements as well as all documents referenced or incorporated therein. This would encompass public reports, CC&Rs, publicly recorded plats and maps, public resolutions or conditions of approval, and homeowners association documents.

A. *What Constitutes the Contract*

1. *Integration Clauses*

Respondent claims that because each of the respective purchase and sale agreements contains an integration clause, the purchase and sale agreements constitute the entire contract. Each purchase and sale agreement states that the

agreement is the sole and entire agreement between the buyer and the seller. Courts have given integration clauses significant weight when interpreting contracts. *See, e.g.*, *Betaco, Inc. v. Cessna Aircraft Co.*, 103 F.3d 1281, 1283 (7th Cir. 1996). California caselaw explains that "'[t]he crucial issue in determining whether there has been an integration is whether the parties intended their writing to serve as the exclusive embodiment of their agreement.'" *Grey v. Am. Mgmt. Servs.*, 139 Cal. Rptr. 3d 210, 213 (Ct. App. 2012) (quoting *Masterson v. Sine*, 65 Cal. Rptr. 545, 547 (1968)). An Arizona court explained: "A completely integrated contract is a contract adopted by the parties as a complete and exclusive statement of the terms of the contract." *Anderson v. Preferred Stock Food Mkts., Inc.*, 854 P.2d 1194, 1197 (Ariz. Ct. App. 1993).

While we agree with respondent that the purchase and sale agreements do contain integration clauses, we do not conclude that the purchase and sale agreement alone serves as the *exclusive* embodiment of the entire agreement between the parties. Buyers of homes from SHI, SHLP, and Vistancia are consciously purchasing more than the "bricks and sticks" of the home. The purchase and sale agreement specifically includes a checklist ensuring that the purchaser receives the related documents.

For the two representative developments in Arizona, Country Lane and Vistancia, the purchase contracts and the closing and escrow instructions include a statement disclosing the purchaser's right to receive and read a copy of the development's public report before signing the purchase agreement. Included is an attached acknowledgment, signified by the purchaser's initials and signature, of the receipt and opportunity to read a copy of the development's public report.

For the five representative developments in California, the purchase contracts and the closing and escrow instructions include California DRE Form RE614E as evidence of the purchaser's receipt of the public report. The document also contains the signature of the purchaser confirming that he/she has read the public report, identified by registration number and date of issuance.

At trial petitioners emphasized that it is not just the house but the lifestyle that SHI, SHLP, and Vistancia advertise

and sell to their purchasers. For the representative developments SHI, SHLP, and Vistancia budgeted and incurred significant indirect costs when compared to the direct costs of building the homes. Purchasers of homes in their developments were conscious of the elaborate amenities and would have understood that the price they paid for a home included the amenities of the development. If a purchaser did not want to live in one of the planned developments with its accompanying amenities, it is likely he or she could have paid much less for an otherwise comparable dwelling outside of a development and with no seller-provided amenities. [16]

Further evidence that SHI, SHLP, and Vistancia were obligated to their lot purchasers for much more than the purchase and sale agreement sans amenities is the hefty performance bonds that were required by State and municipal law in order to secure their performance with respect to the completion of the common improvements in each development. In order for the performance bonds to be exonerated the obligees had to approve the completion of the amenity subject matter. Homeowners associations for each of the representative developments as well as the municipalities and States in which the developments were situated were identified as obligees in the performance bonds. Purchasers automatically became members in the homeowners associations, and thus each purchaser had certain rights as to enforcement of the bonds vis-a-vis the homeowners association.

SHI, SHLP, and Vistancia were also required by State law in California and Arizona to provide a purchaser with a copy of the public report which discloses to the homebuyer the obligations imposed on the homebuyer as well as SHI, SHLP, and Vistancia with respect to the development. SHI, SHLP, and Vistancia were required to obtain a signed acknowledgment from the purchaser that he or she had received the public report, and in Arizona the public report states that the purchase contract is rescindable if the developer fails to provide the purchaser with a copy of the report. The public

---

[16] Indirect costs in, for example, Parkside at Reunion, could amount to over one-fourth of the total development costs. Other raw land developments, such as Trilogy at La Quinta and Vistancia, had similarly large indirect costs. To believe that the consumer homebuyers did not view the fruits of these expenditures as an integral aspect of their home purchase decision strains credibility.

reports for the two Arizona developments also cite the locations of the development maps, which identify the developments' common areas and improvements. The reports indicate the dates the developer anticipates completion of the common area improvements and facilities as well as providing assurances that the common improvements will be completed.

The public reports for the five developments in California state that each purchaser will receive fee title to a lot, membership in the homeowners association, and right to use of the common areas. Each report also provides the developer's estimate of when common areas and improvements will be complete and states that either escrows will not close until completion of the common areas and facilities or bonds have been posted.

Evidence of the home purchasers' extra-purchase and sale agreement obligations are found in the CC&Rs. SHI, SHLP, and Vistancia provided all purchasers with copies of the declaration of CC&Rs for the developments in connection with the sales of homes in their developments, which provided the rights and restrictions with respect to the property purchased. They provided the purchasers with copies of the CC&Rs at or before the time of execution of the purchase and sale agreements, and the purchasers affirmed receipt of the CC&Rs by signing acknowledgments in the purchase and sale agreements or other related documents.

We disagree with respondent's conclusion that the integration clause of the purchase and sale agreements necessarily excludes these documents. Rather, we agree with petitioners that in construing the contracts under section 460, these documents should be and in fact are incorporated into the construction purchase and sale contracts. Not only are these documents exchanged or acknowledged during the signing by the parties, but the purchase and sale agreements reference these documents.

We concur with respondent that mere reference to another document does not mandate incorporation of that document into the contract. *See, e.g.*, *United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390, 411 (Ariz. Ct. App. 1983). Yet, the Arizona court of appeals subsequently stated that "substantially contemporaneous instruments will be read together to determine the nature of the transaction between

the parties." *Pearll v. Williams*, 704 P.2d 1348, 1351 (Ariz. Ct. App. 1985). While no specific wording is required to incorporate another document, the incorporating reference must be clear and unequivocal and "must be called to the attention of the other party, he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties". *United Cal. Bank*, 681 P.2d at 420. Here, the homebuyers acknowledge that they have received and read the public reports as well as the CC&Rs. Not only is the reference called to the purchasers' attention, but they consent, and the document is provided to them by SHI, SHLP, or Vistancia. We believe, therefore, that the purchase and sale agreements incorporate the other referenced documents, such as the public reports, the CC&Rs, the homeowners association documents, and even the publicly recorded maps and conditions of approval.

California courts have rules similar to Arizona's regarding incorporation by reference. *See Avery v. Integrated Healthcare Holdings, Inc.*, 159 Cal. Rptr. 3d 444, 457 (Ct. App. 2013) ("'For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties.'" (quoting *Wolschlager v. Fid. Nat'l Tit. Ins. Co.*, 4 Cal. Rptr. 3d 179, 184 (Ct. App. 2003))). Thus, we believe similarly that the contracts for sale of homes in California incorporated the referenced documents.

In Colorado, a public report is not required. But homebuyers still acknowledged receipt of homeowners association documents, which included maps and legal descriptions of the development, contiguous area reports, which included maps, and a list of easements. And Colorado courts take a view similar to those of California and Arizona on incorporation by reference. *See Taubman Cherry Creek Shopping Ctr., LLC v. Neiman-Marcus Grp., Inc.*, 251 P.3d 1091, 1095 (Colo. App. 2010) ("Pursuant to general contract law, for an incorporation by reference to be effective, 'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'" (quoting 11 Samuel Williston & Richard A. Lord, Contracts, sec. 30.25, at 234 (4th ed.

1999))). We think it clear that the purchase and sale agreements in Colorado also incorporated the referenced documents.

Respondent, however, also cites *Treo @ Kettner Homeowners Ass'n v. Superior Court*, 83 Cal. Rptr. 3d 318 (Ct. App. 2008), as standing for the proposition that CC&Rs cannot be considered contracts. But *Treo* held only that the "developer-written requirement in an association's CC&R's that all disputes between owners and the developer and disputes between the association and the developer be decided by a general judicial reference is not a written contract" because it violated a constitutional right to a jury trial. *Id.* at 326. Further, respondent failed to fully consider the impact of *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 282 P.3d 1217 (Cal. 2012).

The California Supreme Court in *Pinnacle* determined that CC&Rs referenced in purchase and sale agreements were binding on the individual purchasers as well as the homeowners association. *Id.* at 1235. The court distinguished *Treo* as voiding the jury trial waiver in those CC&Rs as unconstitutional, whereas *Pinnacle* involved an agreement to arbitrate, which is favored by public policy. *Id.* at 1231.

Respondent also ignores the multitude of cases in which California courts have characterized CC&Rs as contracts, including those between the developer and the homeowners association. *See, e.g.*, *Villa Milano Homeowners Ass'n v. Il Davorge*, 102 Cal. Rptr. 2d 1, 4–5 (Ct. App. 2000) (construing CC&Rs, to the extent that the purchasers had constructive notice, as a contract between the parties and citing cases where CC&Rs have been construed as contracts). [17]

---

[17] Arizona courts have held that CC&Rs are contracts " 'between the subdivision's property owners as a whole and the individual lot owners.' " *Horton v. Mitchell*, 29 P.3d 870, 872 (Ariz. Ct. App. 2001) (quoting *Ariz. Biltmore Estates Ass'n v. Tezak*, 868 P.2d 1030, 1031 (Ariz. Ct. App. 1993)). Respondent cites *Horton* for the proposition that a CC&R is not a contract between a homebuilder and a buyer. But we are not aware of any caselaw in Arizona or Colorado that would prevent an owner or a homeowners association from bringing suit against a developer for violating CC&Rs. In Colorado this may be because Colorado statutes specifically grant homeowners associations standing to bring construction defect claims on behalf of individual owners for units and common areas even if the CC&Rs do not authorize such a suit. *See Heritage Village Owners Ass'n, Inc. v. Golden Heritage Investors, Ltd.*, 89 P.3d 513, 514–515 (Colo. App. 2004) (citing the

SHI, SHLP, and Vistancia and the buyers of their homes understood and believed that the parties had contracted for the entire lifestyle of the development and its amenities. The purchase and sale agreement is not the exclusive embodiment of that understanding. Consequently, the integration clauses do not limit the entire contract to the naked purchase and sale agreement.

### 2. *State Laws Governing Real Property Sales*

Respondent further contends that State laws regarding real property sales support his position that the contract subject matter consists only of the house, the lot, and improvements to that lot. For instance, the California Civil Code provides: "A real property sales contract may not be transferred by the fee owner of the real property unless accompanied by a transfer of the real property which is the subject of the contract, and real property may not be transferred by the fee owner thereof unless accompanied by an assignment of the contract", Cal. Civ. Code sec. 2985.1 (West 2012), and "[a] real property sales contract is an agreement in which one party agrees to convey title to real property to another party upon the satisfaction of specified conditions set forth in the contract", *id.* sec. 2985(a) (West 2012 & Supp. 2014).

Colorado courts have called the real estate the subject matter of real estate contracts and have noted that when the contract is signed, equitable title immediately transfers to the purchaser although naked legal title remains with the seller. *Dwyer v. Dist. Court, Sixth Judicial Dist.*, 532 P.2d 725, 727 (Colo. 1975). And Arizona statutes define a real estate sales contract as "an agreement in which one party agrees to convey title to real estate to another party upon the satisfaction of specified conditions set forth in the contract." Ariz. Rev. Stat. sec. 32–2101(49) (2012) (West). Thus, according to respondent, in Arizona, Colorado, and California the subject of a real estate contract is the real estate being transferred.

But in California, the legislature has also defined real property to include "[t]hat which is incidental or appurtenant to land". Cal. Civ. Code sec. 658(3) (West 2007). The Colorado

Colorado Common Interest Ownership Act, Colo. Rev. Stat. secs. 38–33.3–101, et seq.).

legislature defines real estate to include "other improvements and interests that, by custom, usage, or law, pass with a conveyance of land though not described in the contract of sale or instrument of conveyance." Colo. Rev. Stat. sec. 38–33.3–103(25) (2013). And the Arizona legislature also includes within the definition of real estate "interests which by custom, usage or law pass with a conveyance of land though not described in the contract of sale or instrument of conveyance." Ariz. Rev. Stat. Ann. sec. 33–1202(19) (2007) (West). We therefore firmly reject respondent's contention that State law definitions of real estate contracts foreclose us from including the above-referenced documents as an integral part of the home purchase contracts.

Respondent also advances the statutes of repose from the three States as supporting his position that the contracts were completed at the close of escrow. These State statutes essentially place a time limit on a homebuyer's right to raise claims against builders or developers. In Arizona, the statute of repose begins upon "substantial completion of the improvement to real property". *Id.* sec. 12–552(A) (2003) (West).

Colorado and California statutes contain similar language. Cal. Civ. Proc. Code sec. 337.15(a), (g) (West 2006); Colo. Rev. Stat. sec. 13–80–104(1)(a) (2013). The California statute defines "substantial completion" to mean the first occurrence of: "(1) The date of final inspection by the applicable public agency. (2) The date of recordation of a valid notice of completion. (3) The date of use or occupation of the improvement. (4) One year after termination or cessation of work on the improvement." Cal. Civ. Proc. Code sec. 337.15(g). The Arizona statute defines the term "substantial completion" as the date the owner or occupant first uses the improvement, the improvement is first available for use after completion, or upon final inspection if required. Ariz. Rev. Stat. Ann. sec. 12–552(E) (2003) (West). The Colorado statute is silent as to the meaning of substantial completion, but Colorado courts have indicated it means at least the issuance of a certificate of occupancy. *Shaw Constr., LLC v. United Builder Servs., Inc.*, 296 P.3d 145, 155–156 (Colo. App. 2012).

We conclude that respondent's emphasis on the statutes of repose is misplaced. These statutes determine the time from the date of completion of an improvement which is afforded to the purchaser to bring suit for construction defects. In

effect, they operate like a statute of limitation. So, in the case of homes, the statutes would necessarily run, for example, from the issuance of a certificate of habitability if that is the earliest triggering event. But a certificate of occupancy for a particular home would have at most a limited impact on a homeowners association's hypothetical cause of action against SHI, SHLP, or Vistancia for a defect in an amenity they had constructed.

Respondent also contends that SHI, SHLP, and Vistancia should not be allowed to hold their homes out as complete for the purposes of obtaining certificates of occupancy under State law while simultaneously representing to the Federal Government that the sales are not complete. Respondent's contention lacks merit. The subject matter of the contract is not limited to the house and the lot, and respondent is comparing two different things.

We concur with petitioners that respondent's interpretations of the relevant State legal definitions of real estate and the statutes of repose are too narrow. When viewed in proper context, the State laws do not necessarily restrict the subject matter of a real estate contract to just a house and the lot upon which it sits. Respondent's analysis is simplistic and short sighted; it does not acknowledge the complex relationships created by the purchase and sales agreement, especially SHI's, SHLP's, and Vistancia's obligations that continue long after the first home is built.

B. *Subject Matter of the Contracts*

Because we determine that, for the purposes of ascertaining the proper use of the completed contract method of accounting as applied to residential home construction, *supra*, the contract consisted of more than the purchase and sale agreement, we must now address the subject matter of the contract. *See* sec. 1.460–1(c)(3)(i), Income Tax Regs. In respondent's view, the subject matter of the contract consists solely of the house, the lot, and improvements to the lot. Under this view, SHI, SHLP, and Vistancia complete their contracts when escrow closes because at that point the final completion and acceptance test is met. *See* sec. 1.460–1(c)(3)(B), Income Tax Regs. In contrast, petitioners assert that the subject matter of the contract encompasses the development in its entirety. Under this view, SHI, SHLP,

and Vistancia complete their contracts for the purposes of section 460 when they incur 95% of the allocable costs attributable to the subject matter of the contract, which is the development as a whole, and the homebuyers use the subject matter. *See* sec. 1.460–1(c)(3)(A), Income Tax Regs. Petitioners contend that the final completion and acceptance test is met only when the last road is paved and the final bond is released.

The regulations accompanying section 460 explicitly acknowledge that the subject matter of a home construction contract extends beyond the construction of a home. *See* sec. 1.460–3(b)(2)(iii), Income Tax Regs. When determining whether a contract qualifies as a home construction contract, the taxpayer takes into account the total costs of dwelling units, improvements to the related real property at the site of the dwelling unit, and the "allocable share of the cost that the taxpayer reasonably expects to incur for any common improvements". *Id.*

Respondent contends that this inclusion is solely for the purposes of determining whether the taxpayer meets the 80% test, which determines whether the contract in question is a home construction contract. Under this theory, a taxpayer computes the 95% completion test, for which the taxpayer uses as a part of the denominator only "total allocable contract costs attributable to the subject matter", sec. 1.460–1(c)(3)(i)(A), Income Tax Regs., without regard to costs allocable to common improvements. But, as petitioners point out, the regulations also state that, in determining when a contract is begun and completed, "a taxpayer must consider all relevant allocable contract costs incurred and activities performed by itself, by related parties on its behalf, and by the customer, that are incident to or necessary for the long-term contract." Sec. 1.460–1(c)(1), Income Tax Regs. According to this interpretation, because the sale price on a home construction contract includes an allocable share of the cost of common improvements, sec. 1.460–3(b)(2)(iii), Income Tax Regs., then the total allocable contract costs must also include the allocable share of common improvement costs. Given the divergent positions, the parties ask the Court to interpret this aspect of the regulations. [18]

---

[18] Implicit in the parties' positions is that the regulation is valid and en-

As an initial matter, we must ask what deference, if any, we should give to respondent's interpretation of the regulations. Neither party appears to address this issue. Respondent appears to believe that no such inquiry is necessary because the regulation is clear on its face. While he concedes that "[t]he regulations do not define the phrase 'subject matter of the contract'", he also contends that we should give those words their "ordinary, contemporary meaning", implying that no ambiguity in the regulation exists.

Petitioners also do not address or raise the issue of whether and to what extent we should defer to respondent's interpretation of the regulations. But, petitioners' briefs are replete with references to respondent's "litigating position", presumably a reference to precedent in which we have declined to give deference to litigating positions. *See, e.g.*, *Garnett v. Commissioner*, 132 T.C. 368, 381 (2009) (citing *Gen. Dynamics Corp. & Subs. v. Commissioner*, 108 T.C. 107, 120–121 (1997)); *see also Stromme v. Commissioner*, 138 T.C. 213, 223 n.2 (2012) (Holmes, J., concurring); *Pierre v. Commissioner*, 133 T.C. 24, 40–41 (2009) (Cohen, J., concurring), *supplemented by* T.C. Memo. 2010–106.

Petitioners use the term "litigating position" presumably in an attempt to distinguish the current set of facts from that of *Auer v. Robbins*, 519 U.S. 452, 461 (1997), in which the Supreme Court deferred to an agency's interpretation of its own regulations expressed in an amicus brief requested by the Court. Generally, courts do not have to defer to such litigating positions that are unsupported by regulations, rulings, or administrative practice. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988). Respondent does not claim that his

titled to deference under *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). These positions are understandable in the light of administrative law governing deference to regulations, *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44 (2011), and the congressional directive to the Secretary to promulgate regulations concerning accounting for long-term contracts, sec. 460(h); *see ADVO, Inc. & Subs. v. Commissioner*, 141 T.C. 298, 322 (2013). *But cf. United States v. Home Concrete & Supply, LLC*, 566 U.S. ____, 132 S. Ct. 1836 (2012). Likewise, as to Administrative Procedure Act requirements, see *Dominion Res., Inc. v. United States*, 681 F.3d 1313 (Fed. Cir. 2012), *Cohen v. United States*, 650 F.3d 717 (D.C. Cir. 2011), and *Burks v. United States*, 633 F.3d 347 (5th Cir. 2011).

position in these cases constitutes "fair and considered judgment on the issue" rather than "a post hoc rationalization for past agency action". *Massachusetts v. Sebelius*, 638 F.3d 24, 34 (1st Cir. 2011) (citing *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 209 (2011)). Thus, respondent does not argue his position is entitled to any special deference, and we accord it none.

In matters of regulatory construction, the rules of statutory construction apply. *Caltex Oil Venture v. Commissioner*, 138 T.C. 18, 34 (2012). The starting point for interpreting a statute or a regulation is its plain and ordinary meaning unless such an interpretation "would produce absurd or unreasonable results." *Union Carbide Corp. v. Commissioner*, 110 T.C. 375, 384 (1998). Undefined words take their "ordinary, contemporary, common meaning." *Hewlett-Packard Co. & Consol. Subs. v. Commissioner*, 139 T.C. 255, 264 (2012). "Subject matter" is not defined by the regulations or the statute. According to respondent the plain meaning of "subject matter of the contract" means only the house, the lot, and improvements on that lot. Petitioners, however, contend that the term "subject matter of the contract" must be viewed in the light of the regulatory definition of a home construction contract.

We disagree with the basic premise of respondent's contention. "Subject matter of the contract" does not in our view have the plain meaning he contends. As we concluded above, SHI's, SHLP's, and Vistancia's contracts each encompass more than just the house, the lot, and the improvements to the lot. If we were to ascribe a plain meaning to the term, then the subject matter of the contracts would include the common improvements.

Further supporting the view that the regulation is not as narrow as respondent contends is the context of the regulatory scheme generally. In construing the regulation, we do not just look at the words or phrases in isolation, but rather we read these words and phrases in their context and with a view to their place in the overall statutory scheme. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Thus, we look at the contract completion tests in section 1.460–1(c)(3), Income Tax Regs., in the context of the entire section 460 regulatory scheme, including section

1.460–3, Income Tax Regs., concerning long-term construction contracts, and, of course, the statute itself.[19]

Section 1.460–1(c)(3)(i)(A), Income Tax Regs., states that the contract is completed upon "[u]se of the subject matter of the contract by the customer for its intended purpose (other than for testing) and at least 95 percent of the total allocable contract costs attributable to the subject matter have been incurred by the taxpayer". The final completion and accept-

---

[19] The little legislative history that exists supports our conclusions. Before 1986 taxpayers could account for long-term contracts under what is known as the completed contract method or the percentage of completion method. See sec. 446(c) until 1965, then sec. 451 (1954 as amended), and sec. 1.451–3(a), Income Tax Regs. (1986).

In 1986, Congress began to cut back on the completed contract method, allowing only 60% of revenue to be deferred under this method. Tax Reform Act of 1986, Pub. L. No. 99–514, sec. 804(a), 100 Stat. at 2358. In 1987 this percentage was reduced to 30%. Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100–203, sec. 10203, 101 Stat. at 1330–394. In 1988 Congress further scaled back the amount of income that could be deferred under the completed contract method. TAMRA sec. 5041. By 1989 long-term contracts had to be reported under the percentage of completion method. Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101–239, sec. 7621(a), 103 Stat. at 2375.

Congress added the exception for home construction contracts from the percentage of completion method of accounting as an intended relief measure in 1988 as part of TAMRA. Senator Dennis DeConcini and Representative Richard T. Schulze each proposed identical amendments to the respective Senate and House versions of the bill. S. 2694, 100th Cong. (1988) (text at 134 Cong. Rec. 20862 (Aug. 8, 1988)); H.R. 5151, 100th Cong. (1988). Both legislators were concerned with the potential recognition of income not yet received by the homebuilders and matching costs with revenues. 134 Cong. Rec. 20722–20723 (Aug. 5, 1988) (Sen. DeConcini); 29962–29963 (Oct. 12, 1988) (Sen. DeConcini); 134 Cong. Rec. 20202 (Aug. 3, 1988) (Rep. Schulze). They were also reacting to an advance release of an IRS pronouncement that would apply the percentage of completion method of accounting to contracts for the construction and sale of a home. *See also* Notice 88–66, 1988–1 C.B. 522, 554.

Their proposed amendments were narrower than what ultimately emerged from conference. They called for an exemption for residential real property contracts that were estimated to be completed within 12 months of being entered into. S. 2694; H.R. 5151. Senator DeConcini believed this 12-month rule would prohibit deferral for builders of custom homes. 134 Cong. Rec. 20723. The conference report is silent as to the rationale for the home construction contract exception as it exists now, but what ultimately emerged was broader than the earlier proposed 12-month rule. What matters is the law as written. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 403 (2010).

ance test states simply: "Final completion and acceptance of the subject matter of the contract." Sec. 1.460–1(c)(3)(i)(B), Income Tax Regs. But "to determine whether final completion and acceptance of the subject matter of a contract have occurred, a taxpayer must consider all relevant facts and circumstances." Sec. 1.460–1(c)(3)(iv)(A), Income Tax Regs. In one test, the taxpayer looks to allocable costs attributable to the subject matter of the contract; in the other test, all relevant facts and circumstances inform the subject matter of the contract. It is clear that, in the context of the language surrounding the phrase "subject matter of the contract", the definition is necessarily broader than that advocated by respondent.

The context of the phrase in relation to the rest of the regulatory scheme also indicates a broader interpretation. As stated earlier, section 460 defines "home construction contract" for the purposes of a specific subsection. Sec. 460(e)(6)(A). And, as mentioned, the regulations expand this definition to allow taxpayers to include the "allocable share of the cost that the taxpayer reasonably expects to incur for any common improvement". Sec. 1.460–3(b)(2)(iii), Income Tax Regs. While the definition of "home construction contract" in the statute and the regulations does not necessarily mean that this definition carries over to the use of the term "contract" in the rest of the statute and the regulations, it is at a minimum instructive.

In addition, the regulations instruct taxpayers to "consider all relevant allocable contract costs * * * that are incident to or necessary for the long-term contract", sec. 1.460–1(c)(1), Income Tax Regs., in determining the contract commencement and completion dates. And "allocable contract costs" is a defined term. Sec. 1.460–1(b)(3), Income Tax Regs. For the purposes of home construction contracts, such costs include "the cost of any activity that is incident to or necessary for the taxpayer's performance under a long-term contract." Sec. 1.460–5(d)(1), Income Tax Regs. The regulations expressly include within the definition of "allocable contract costs" indirect costs such as those related to equipment and facilities, labor, indirect materials and supplies, quality control and inspection, and certain taxes. Sec. 1.460–5(d)(2)(i), Income Tax Regs.

Thus, at the very minimum, the 95% completion test, as applied here, looks to costs beyond just those associated with the house, the lot, and improvements to the lot. The facts and circumstances gloss on the final completion and acceptance test also indicates that the subject matter of the contract in these cases is more than just the house, the lot, and improvements to the lot. Ultimately, this outcome is supported by our conclusion, *supra*, that SHI's, SHLP's, and Vistancia's contracts consist of more than the purchase and sale agreement alone. When the contract documents are read together, the subject matter of the contract is quite clearly more than just the house, the lot, and improvements to the lot.

Respondent further contends that, under these contracts, the 95% completion test can never occur before final completion because the 95% completion test contains a use requirement. *See* sec. 1.460–1(c)(3)(A), Income Tax Regs. Under this theory, the subject matter is the house and the lot, and the subject matter is used on the same day the contract is completed and accepted. Respondent bases his contention on the erroneous assumption that the subject matter of the contract is only the house and lot. While the house may be complete as of the close of escrow and the purchaser may be using the house at that time, the entire subject matter of the contract may not yet be completed or used.

The subject matter of the contract includes the house, the lot, and improvements to the lot as well as the common improvements in the development. Thus, for the purpose of the 95% completion test, SHI, SHLP, and Vistancia correctly tested the total allocable costs associated with the development against the costs incurred to date. For purposes of the final completion and acceptance test, SHI, SHLP, and Vistancia appropriately decided that, on the basis of the facts and circumstances, final completion did not occur until the final bonds were released and the final road paved.[20]

---

[20] Sec. 1.460–1(c)(3)(iv)(A), Income Tax Regs., contains a caveat as to the facts and circumstances component of the completion and acceptance test: "Nevertheless, a taxpayer may not delay the completion of a contract for the principal purpose of deferring federal income tax." Respondent does not suggest that SHI, SHLP, or Vistancia intentionally delayed the completion of their contracts, either through not paving the final road or not securing

In addition, respondent contends that in effect what SHI, SHLP, and Vistancia have done is the same as aggregating the different home purchase contracts. As respondent correctly points out, taxpayers are to apply the completion tests of the regulations on a contract-by-contract basis. *See* sec. 1.460–1(c)(3)(i), Income Tax Regs. The statute and the regulations do allow taxpayers to aggregate contracts, but only in certain situations, for the purposes of section 460. Sec. 460(f)(3); sec. 1.460–1(e), Income Tax Regs. According to respondent, not only do the aggregation rules not apply in these cases but SHI, SHLP, and Vistancia did not file the requisite statement with their Federal income tax returns as required by the regulations. *See* sec. 1.460–1(e)(4), Income Tax Regs. But SHI, SHLP, and Vistancia did not aggregate contracts. Rather, they tested completion dates of individual contracts using their conception of the subject matter of those contracts.

To summarize, we agree with petitioners that the contracts consist of more than just the purchase and sale agreements and that the subject matter of the contracts includes the costs of common improvements for the purpose of testing their completion date. Therefore, the contracts will generally meet the 95% completion test before they meet the final completion and acceptance test. Under the completed contract method of accounting, SHI, SHLP, and Vistancia are entitled to defer income from their contracts until 95% of the total contract costs, allocable to the subject matter of the contract, is incurred or the development or phase of the development, as the case may be, is completed and accepted.

## C. *Secondary Items*

Respondent asks that if we agree with petitioners' reading of "subject matter of the contract" then we find that the costs not directly associated with the houses, the lots, and improvements to the lots constitute secondary items under section 1.460–1(c)(3)(ii), Income Tax Regs. Respondent contends that because SHI, SHLP, and Vistancia and the homebuyers treated the common improvements contemplated in the contract as secondary items "subordinate in importance

_____

the release of the final bond. We mention this caveat only for the sake of completeness.

to the house", the regulations forbid them from taking those items into account in determining the contract completion date. Petitioners, on the other hand, maintain that these common improvements are not secondary items and that the parties to each contract did not treat or consider the items as secondary items in the contracts but rather integral aspects of the homes' purchase and sale.

Section 1.460–1(c)(3)(ii), Income Tax Regs., provides:

(ii) Secondary items. The date a contract accounted for using the CCM [completed contract method] is completed is determined without regard to whether one or more secondary items have been used or finally completed and accepted. If any secondary items are incomplete at the end of the taxable year in which the primary subject matter of a contract is completed, the taxpayer must separate the portion of the gross contract price and the allocable contract costs attributable to the incomplete secondary item(s) from the completed contract and account for them using a permissible method of accounting. A permissible method of accounting includes a long-term contract method of accounting only if a separate contract for the secondary item(s) would be a long-term contract, as defined in paragraph (b)(1) of this section.

The regulations do not define "secondary items", and ordinarily we would resort to the tools of regulatory analysis discussed above. But respondent and petitioners are essentially in agreement as to the meaning of this phrase. In their briefs, they both urge us to read secondary items as items that the contracting parties intend to be secondary. We concur that the questions of what is a secondary item in a contract and what is the primary subject matter of a contract are questions to be answered by reference to the facts and intent of the contracting parties.

Here again, the parties' disagreement over the nature of the contracts becomes paramount. Respondent's interpretation of the contracts as being merely about the house, the lot, and the improvements to the lot necessarily informs his belief that the common improvements must be secondary items. Similarly, petitioners' view of the contracts as being about the lifestyle including access to the planned community, the amenities, and the infrastructure, necessarily informs their belief that the common improvements are part of the primary subject matter of the contract.

We agree with petitioners. As discussed at length, the contractual documents consist of more than just the purchase and sale agreement. When the contract documents are exam-

ined together, it becomes readily apparent that the primary subject matter of the contracts includes the house, the lot, improvements to the lot, and common improvements to the development. As a factual matter, we find the amenities to be of great importance to and a crucial aspect of SHI's, SHLP's, and Vistancia's sales effort, obtaining of governmental approval of the development, and the buyers' purchase decision, and thus the amenities are an essential element of the home purchase and sale contract.

D. *Conclusion*

We have found that the contract documents consist of much more than just the purchase and sale agreement. This conclusion leads us to hold that SHI, SHLP, and Vistancia appropriately included the costs of common improvements in determining the contract completion date. Furthermore, the nature of the business and the contract documents also lead us to conclude that the common improvements are not secondary items and do not have to be accounted for separately.

IV. *Clear Reflection of Income*

We have determined that SHI, SHLP, and Vistancia properly used a permissible method of accounting. Yet the question remains whether that method of accounting clearly reflects income. *See* sec. 446(b). The Commissioner has wide discretion in determining whether a method of accounting clearly reflects income. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532 (1979). If, however, SHI's, SHLP's, and Vistancia's method of accounting clearly reflects income, then respondent cannot be permitted to change their method of accounting even to a method that more clearly reflects income. *Photo-Sonics, Inc. v. Commissioner*, 357 F.2d 656, 658 n.1 (9th Cir. 1966), *aff'g* 42 T.C. 926 (1964); *Keith v. Commissioner*, 115 T.C. 605, 617 (2000). Whether a method of accounting clearly reflects income is a question of fact. *Peninsula Steel Prods. v. Commissioner*, 78 T.C. 1029, 1045 (1982).

SHI, SHLP, and Vistancia expended a great deal of capital early on in the construction of their developments. The land acquisition costs alone were a large percentage of the total development cost. On top of that, they incurred upfront costs

such as grading the land, installing sewer, water, gas, electric, and other utilities, and constructing roads, not to mention the entitlement costs and bond costs. Many of these costs were incurred before the first home was constructed, let alone sold. Once they began selling homes, it was some time before revenue from those sales exceeded the already incurred project costs. They were contractually or legally required to complete the items associated with these costs. Because their projects were longer projects, and given the nature of the home construction industry, costs are difficult to predict, and they could not accurately determine their profit until the development was nearly completed.

The completed contract method of accounting is a narrow exception to the legislated rule that most long-term contracts must now be accounted for under the percentage of completion method of accounting. But the clearly articulated exception for homebuilders is, as to them, generously broad and reflects a deliberate choice by Congress that home construction contracts should be treated differently and accorded the more generous deferral of the completed contract method. SHI's, SHLP's, and Vistancia's use of the completed contract method was specifically contemplated by Congress and is a permissible, congressionally sanctioned clear reflection of income.

We note that SHLP admittedly applied the 95% completion test in 2002 and 2003 by comparing the number of homes closed in escrow in the development to the number of homes projected to be built in the development. This calculation was an incorrect application of the completed contract method of accounting. But the 2002 tax year is not in issue, and the parties introduced evidence showing that for SHLP's long-term contracts in 2003, the 95% completion test had not yet been met. Thus, the completed contract method of accounting as properly applied renders the same result as the result which was reported for the 2003 tax year, and it clearly reflects the income of SHLP for that 2003 tax year.

Respondent points out that Trilogy at La Quinta and Vistancia were divided into phases for purposes of testing contract completion, but other developments were not similarly divided. Respondent appears to be implying that such a discrepancy in the application of the 95% completion test demonstrates that SHI's, SHLP's, and Vistancia's use of the

completed contract method does not clearly reflect income. For instance, the entire Costa Azul development, as indicated by the public report, was to consist of 17 phases, which at first glance seems like a lot. But a closer look at the public report reveals that the projected total number of homes in Costa Azul was 83, and each phase was to be rather small. For instance, phase 10 consisted of four residential lots. Trilogy, on the other hand, was to consist of 23 phases with a projected 1,365 residences on 1,203 residential lots. The ninth phase was to consist of 48 residential lots.

In addition, for the purposes of these cases, the parties stipulated that the Costa Azul development as contemplated by SHLP was only a small, relatively short-term buildout aspect of that overall development. In effect, it was equivalent to a phase of the overall development. The Costa Azul development, as initially proposed to the Land Committee, was a short-term, 37-home development, and, as stipulated by the parties, Costa Azul was developed in eight phases with 42 total lots.[21] While Costa Azul as presented in this case differs from Costa Azul as presented in the public report, SHLP's use of the completed contract method of accounting clearly reflected income. There is no material evidence in the record, and we discern none, that SHLP attempted to manipulate or to delay its Costa Azul project or contracts to obtain a longer deferral period.[22]

Respondent also contends that petitioners' interpretation of the subject matter of the contract "creates the nonsensical situation of the subject matter of each individual contract for the sale of a house being the entire development and, thus, including the subject matter of every other past, present, and future house." He goes on to state that a purchaser of one

---

[21] The record is unclear why the number of lots as stipulated differs from the number of homes projected in the Land Committee report. Perhaps some houses were constructed on multiple lots, or some lots were used as common areas. What is clear is that the project as originally contemplated in the public report did not fully materialize when the real estate market turned and SHLP did not purchase the remaining lots.

[22] The appropriate scope of each contract as it involves common or exclusive off-lot amenities is a factual question. Respondent has not shown that SHI's, SHLP's, or Vistancia's choices of development or phase as the scope for purposes of the 95% test as it involves off-lot amenities were improper or unreasonable as to any of the eight representative developments.

home has no claim to any unsold or previously sold lots and homes. Certainly this latter statement is correct. The contract does not include the houses and lots other than that which is purchased; but the subject matter of each individual purchased house still includes the development or phase of the development and its common improvements and amenities. Thus, while there are commonalities in the subject matters of the contracts, such as the amenities and other common improvements, the subject matters as to the individual house and lot are not identical. [23]

For these reasons, we conclude that respondent may not change SHI's, SHLP's, and Vistancia's method of accounting even if his proposed method more clearly reflects income. *See Prabel v. Commissioner*, 91 T.C. at 1112.

## V. *Conclusion*

SHI, SHLP, and Vistancia are permitted to report income and loss from the sales of homes in their planned developments using the completed contract method of accounting as consistent with this Opinion. [24]

---

[23] Furthermore, we reject the characterization that what SHI, SHLP, and Vistancia have done, and what we approve of, is in substance an aggregation of contracts. Contracting parties have a right to their own contract for the purposes of State law, and it is this contract that we test in determining the subject matter of the contract. In the case of much larger, decades-long developments, the meeting of the minds between the purchaser and the seller would be much less likely to include an amenity or common improvement with a completion date unreasonably far in the future. Here, the subject matter of SHI's, SHLP's, and Vistancia's contracts includes the development. In a different case, under different facts, similar treatment of an unreasonably long-term development may in essence be an aggregation.

[24] We are cognizant that our Opinion today could lead taxpayers to believe that large developments may qualify for extremely long, almost unlimited deferral periods. We would caution those taxpayers that a determination of the subject matter of the contract is based on all the facts and circumstances. If Vistancia, for example, attempted to apply the contract completion tests by looking at all contemplated phases, it is unlikely that the subject matter as contemplated by the contracting parties could be stretched that far. Further, sec. 1.460–1(c)(3)(iv)(A), Income Tax Regs., may prohibit taxpayers from inserting language in their contracts that would unreasonably delay completion until such a super development is completed.

The Court has considered all of the parties' contentions, arguments, requests, and statements. To the extent not discussed herein, the Court concludes that they are meritless, moot, or irrelevant.

*Decisions will be entered for petitioners*.