**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SHEA HOMES, INC. AND SUBSIDIARIES, *Petitioner-Appellee*, v. COMMISSIONER OF INTERNAL REVENUE, *Respondent-Appellant.* | No. 14-72161 Tax Ct. No. 29271-09 |
| SHEA HOMES, LP; JF SHEA, LP, FKA JF Shea LLC, Tax Matters Partner, *Petitioners-Appellees*, v. COMMISSIONER OF INTERNAL REVENUE, *Respondent-Appellant.* | No. 14-72162 Tax Ct. No. 1400-10 |

VISTANCIA, LLC; SHEA HOMES
SOUTHWEST, INC., Tax Matters
Partner,
                *Petitioners-Appellees*,

                v.

COMMISSIONER OF INTERNAL
REVENUE,
                *Respondent-Appellant.*

No. 14-72163

Tax Ct. No.
1401-10

OPINION

Appeals from Decisions of the
Tax Court

Argued and Submitted June 7, 2016
Pasadena, California

Filed August 24, 2016

Before: Ferdinand F. Fernandez, Johnnie B. Rawlinson,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Fernandez;
Concurrence by Judge Rawlinson

# SUMMARY[*]

## Tax

The panel affirmed the Tax Court's decisions that taxpayers Shea Homes, Inc. and Subsidiaries did not have any deficiencies and that taxpayers Shea Homes, LP and Vistancia, LLC had no adjustments to partnership items for certain tax years, based on a challenge to the completed-contract accounting method for home construction contracts.

Taxpayers are planned community builders and developers in Colorado, California, and Arizona. Because their projects tended to involve long-term home construction contracts extending across more than one tax year, they applied the completed-contract accounting method to report income, where the completion year is the taxable year in which a taxpayer completes a contract. *See* 26 U.S.C. § 460(e)(1)(a); 26 C.F.R. §§ 1.460-1–1.460-4. The Commissioner contended that the subject matter of the contracts was limited to the house and lot; the Tax Court determined that, as a matter of fact, the subject matter included the house, lot, development, and its common improvements and amenities. The panel held that the Tax Court did not clearly err in its determination, noting that until taxpayers' work was complete, they had an obligation to fulfill their promises regarding the development that they had induced the buyers to become a part of. The panel affirmed the Tax Court's decision that taxpayers had used a

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

permissible method of accounting that clearly reflected their income.

Judge Rawlinson concurred in the judgment, solely on the basis that the Commissioner is bound by the arguments and theories relied upon during the trial before the Tax Court, because "our precedent is replete with cases precluding a party from endeavoring to assert a theory on appeal that was not presented to the trial court." Judge Rawlinson would affirm the Tax Court's decision solely on the basis that the Commissioner failed to raise the issue raised in this appeal — whether the subject of each construction contract is the entire development — sufficiently for the Tax Court to rule on it.

## COUNSEL

Andrew M. Weiner (argued) and Richard Farber, Attorneys, Tax Division; Caroline D. Ciraolo, Assistant Attorney General; Department of Justice, Washington, D.C., for Respondent-Appellant.

Gregory G. Garre (argued), Gerald A. Kafka, Sean M. Akins, and Benjamin W. Snyder, Latham & Watkins LLP, Washington, D.C.; Robert A. Long, Jr. and Kevin King, Covington & Burling LLP, Washington, D.C.; for Petitioners-Appellees.

## OPINION

FERNANDEZ, Circuit Judge:

The Commissioner of Internal Revenue ("Commissioner") appeals the decisions of the United States Tax Court in these consolidated cases that Shea Homes, Inc. and Subsidiaries ("SHI") did not have any deficiencies for the tax years under consideration and that Shea Homes, LP ("SHLP") and Vistancia, LLC ("Vistancia") had no adjustments to partnership items for their tax years which were under consideration.[1]  Hereafter, SHI, SHLP and Vistancia are collectively referred to as "the Taxpayers."[2] The decisions flowed from the Tax Court's determination[3] that the Taxpayers had used an accounting method[4] that clearly reflected their income during the tax years under consideration.  We affirm.

## BACKGROUND

The Tax Court found that the Taxpayers are builders and developers of planned communities "ranging in size from 100

---

[1] For SHI those were tax years 2004 and 2005.  For SHLP those were tax years 2003, 2004, 2005, and 2006. For Vistancia, those were tax years 2004 and 2005.

[2] We recognize that, technically, SHLP and Vistancia do not themselves pay taxes.  We use "the Taxpayers" for convenience of reference only.

[3] *Shea Homes, Inc. v. Comm'r*, 142 T.C. 60 (2014).  We note that many of the background facts were stipulated to by the parties and incorporated into the Tax Court's decision.

[4] *See* 26 C.F.R. § 1.460-1(c)(3)(i)(A); *see also id.* § 1.446-1(a)(1).

homes to more than 1,000 homes in Colorado, California, and Arizona." *Shea Homes*, 142 T.C. at 64. It further determined that:

> [The Taxpayers] pride themselves on providing their customers with more than just the "bricks and sticks" of a home and emphasize the features and lifestyle of the community to potential buyers. For example, at the Reunion at Parkside community they advertised using the themes "live well, work well, play well" and "the pursuit of happiness".

> [The Taxpayers] purchased land in various stages from completely raw to finished lots in developed communities. Their business involved the analysis and acquisition of land for development and the construction and marketing of homes and the design and/or construction of developments and homes on the land they acquired. The costs incurred in their home construction business included, by partial example: (1) acquisition of land; (2) financing; (3) municipal and other regulatory approvals of entitlements; (4) construction of infrastructure; (5) construction of amenities; (6) construction of homes; (7) marketing; (8) bonding; (9) site supervision and overhead; and (10) taxes. Their primary source of revenue from the home development business was from the sale of houses.

*Id.* at 65. Because of the magnitude of those undertakings, the process tends to extend across more than one tax year. *See* 26 U.S.C. § 460(f)(1); 26 C.F.R. §§ 1.460-1(b)(5)–(6), 1.460-3(a).

Although the Internal Revenue Code generally requires that a taxpayer report income in "the taxable year in which [it was] received," 26 U.S.C. § 451(a), it also provides special rules for reporting taxable income from long-term contracts, *id.* § 460. "A long-term contract generally is any contract for the . . . construction of property if the contract is not completed within the contracting year. . . ." 26 C.F.R. § 1.460-1(b)(1); *see also* 26 U.S.C. § 460(f)(1). Typically, taxable income from long-term contracts must "be determined under the percentage of completion method" of accounting. 26 U.S.C. § 460(a). But home construction contracts are exempt from that requirement. *Id.* § 460(e)(1)(A); 26 C.F.R. § 1.460-3(b)(1). Instead, the regulations prescribe several acceptable methods of accounting for home construction contracts (and other contracts exempt from the percentage-of-completion method of accounting), one of which is the completed-contract method ("CCM") of accounting. 26 C.F.R. § 1.460-4(c)(1); *see also id.* (a).[5]

---

[5] Under the percentage-of-completion method of accounting, a taxpayer must generally recognize as income a portion of the contract price in each taxable year covered by the long-term contract. *See* 26 C.F.R. § 1.460-4(b)(1). By contrast, under the CCM, a taxpayer generally does not recognize any income from a long-term contract until the contract is complete. *See id.* § 1.460-4(d)(1). The CCM is thus more favorable to taxpayers because it generally defers the taxation of income relative to the percentage-of-completion method.

The parties agree that the contracts at issue here are long-term home construction contracts. *See* 26 U.S.C. § 460(e)(1)(A), (6)(A). The Taxpayers applied the CCM to report income from their home construction projects. "[A] taxpayer using the CCM to account for a long-term contract must take into account in the contract's completion year, as defined in § 1.460-1(b)(6), the gross contract price and all allocable contract costs incurred by the completion year." 26 C.F.R. § 1.460-4(d)(1). "The completion year is the taxable year in which a taxpayer completes a contract as described" by the applicable regulation. *Id.* § 1.460-1(b)(6). That regulation, in turn, provides that:

> A taxpayer's contract is completed upon the earlier of—
>
> (A) Use of the subject matter of the contract by the customer for its intended purpose (other than for testing) and at least 95 percent of the total allocable contract costs attributable to the subject matter have been incurred by the taxpayer; or
>
> (B) Final completion and acceptance of the subject matter of the contract.

*Id.* § 1.460-1(c)(3)(i).**[6]** The date of contract completion should be "determined without regard to whether one or more secondary items have been used or finally completed and accepted." *Id.* § 1.460-1(c)(3)(ii).

---

**[6]** We refer to these alternative methods as the "95 percent test" and the "final completion test," respectively.

During the tax years at issue here, the Taxpayers reported their income using the CCM. They applied the 95 percent test to determine the year of contract completion and, hence, the year in which they recognized income from their long-term home construction contracts. The Taxpayers took the position that the subject matter of their home construction contracts included the development in which the home was situated. For each tax year, the Taxpayers would calculate, on a development-by-development basis, whether they had incurred at least 95 percent of the budgeted costs of the development, including the costs of the houses and the common improvements and amenities.

> If the incurred costs were equal to or greater than 95% of the budgeted costs, then [the Taxpayers] reported income for that tax year from homes that had closed in escrow up to that date. If the incurred costs did not exceed 95%, then [the Taxpayers] deferred any income from homes that closed in escrow that year.

*Shea Homes*, 142 T.C. at 76.[7]

---

[7] Two matters bear mentioning. First, SHLP incorrectly applied the 95 percent test in tax years 2002 and 2003: It calculated a development's completion ratio by comparing the number of homes built to the number of homes projected to be built, when it should have compared the costs incurred to the projected costs. However, this error was immaterial. *See Shea Homes*, 142 T.C. at 107. Second, with respect to certain large developments, the Taxpayers applied the 95 percent test on a phase-by-phase basis, rather than a development-wide basis. *See id.* at 107–08. In other words, for purposes of applying the 95 percent test, the Taxpayers treated certain large developments as if they comprised several smaller developments, and applied the 95 percent test to each sub-development.

In 2009, the Commissioner issued a notice of deficiency to SHI for the tax years 2004–2005, and notices of final partnership administrative adjustments to SHLP for 2003–2006 and to Vistancia for 2004–2005. Each notice provided the same explanation for the Commissioner's action: that is, the "amounts can not be deferred under the completed contract method of accounting until the completion of a future common improvement" because "the primary subject matter of the contract" was the home, and "[t]he cost of common improvements and any future obligations are secondary items and do not impact when a contract is completed on the subject matter." In effect, the Commissioner took the position that for purposes of applying the CCM, the subject matter of a contract for sale of a house in a planned community development was limited to the house and lot alone and that anything else—for example, the common improvements—constituted "secondary items" to be ignored in determining when the contract was completed. *See* 26 C.F.R. § 1.460-1(c)(3)(ii). Thus, in the Commissioner's view, the Taxpayers' home construction contracts were complete, under the final completion test, once a home purchase closed in escrow. That meant that contracts entered into and closed in escrow in a single tax year were not long-term contracts at all, and that income from home construction contracts entered into in one tax year but closed in another tax year had to be recognized for tax purposes once the home purchase closed in escrow, even if the Taxpayers had not yet finished the development or the common improvements and amenities to which the buyer was entitled pursuant to his sale contract with the Taxpayers.

---

This reduced the deferral of taxable income that would have resulted if the Taxpayers had applied the 95 percent test on a development-wide basis.

The Taxpayers disagreed and pointed out that the subject matter of their contracts with their buyers went beyond a mere house and lot sale, but included much more; the subject matter included the common improvements and the other requirements needed to create a house within the particularly oriented planned community development that the buyer had bargained for. Therefore, they said, they had properly applied the 95 percent test to determine the date of contract completion, and their method of accounting reflected the subject matter of their home construction contracts and clearly reflected income. The Taxpayers contended that the Commissioner's proposed method—that is, recognizing income upon closing of a home purchase in escrow—did not clearly reflect income.

The Tax Court essentially agreed with the Taxpayers. In a careful and detailed opinion, the Tax Court concluded that on the evidence before it all aspects of the planned community development were understood by the Taxpayers and their buyers to be what was bargained for, and that the documents reflected that understanding. As the Tax Court put it: "[The Taxpayers] and the buyers of their homes understood and believed that the parties had contracted for the entire lifestyle of the development and its amenities." *Shea Homes*, 142 T.C. at 95. Ultimately, it concluded that "[t]he contract does not include the houses and lots other than that which is purchased; but the subject matter of each individual purchased house still includes the development or phase of development and its common improvements and amenities." *Id.* at 109. Thus, the decisions in favor of the Taxpayers were entered, and these consolidated appeals by the Commissioner followed.

On appeal, the Commissioner has taken a different approach from the one he took at the Tax Court. The Commissioner concedes that the Tax Court correctly held that the subject matter of the Taxpayers' home construction contracts includes more than just the house and lot purchased. He accepts the notion that the subject matter of the contract also includes the common improvements of the planned community development in which the house is situated, which improvements the Taxpayers are contractually obligated to build. But the Commissioner now takes issue with how the Taxpayers applied the 95 percent test. During the relevant tax years, the Taxpayers deemed their home construction contracts complete for purposes of the CCM when they had incurred 95 percent of the budgeted costs for building the entire community, including the costs of building all of the houses in the community. *See* 26 C.F.R. § 1.460-1(c)(3)(i)(A). In the Commissioner's current view, the subject matter of the contract includes the house, lot and common amenities, but does not include the other houses in the community. Accordingly, he argues that the 95 percent test should be met when the Taxpayers incur 95 percent of the budgeted costs of the contracted-for house, lot and common amenities, but not the costs of the other houses. *See id.* We discuss this late-blooming argument further below.

JURISDICTION AND STANDARDS OF REVIEW

The Tax Court had jurisdiction pursuant to 26 U.S.C. §§ 6213(a), 6214(a), 6226, 7442. We have jurisdiction pursuant to 26 U.S.C. § 7482(a) and 28 U.S.C. § 1291.

We review decisions of the Tax Court "'on the same basis as decisions in civil bench trials in district court.'" *Estate of Ashman v. Comm'r*, 231 F.3d 541, 542 (9th Cir. 2000). We

review conclusions of law and mixed questions of law and fact de novo; we review findings of fact for clear error. *Meruelo v. Comm'r*, 691 F.3d 1108, 1114 (9th Cir. 2012); *Ball, Ball & Brosamer, Inc. v. Comm'r*, 964 F.2d 890, 891 (9th Cir. 1992).  A mixed question of law and fact is one in which the "primary facts are undisputed and ultimate inferences and legal consequences are in dispute." *Suzy's Zoo v. Comm'r*, 273 F.3d 875, 878 (9th Cir. 2001).

## DISCUSSION

The United States Internal Revenue Code allows a taxpayer some discretion in selecting an accounting method by which to report his income,[8] but that method must "clearly reflect income."[9]  If the Commissioner determines that the taxpayer's method does not clearly reflect income, the Commissioner "has wide discretion in choosing an income-reconstruction method" for the taxpayer. *Palmer v. IRS*, 116 F.3d 1309, 1312 (9th Cir. 1997).  The Commissioner's determinations are entitled to a presumption of correctness, although the taxpayer may prove them wrong. *Id.*; *see also* 26 U.S.C. § 446(b).  In the event that the Commissioner issues a deficiency notice (or a final partnership administrative adjustment), as he did here, a taxpayer may petition the Tax Court for a redetermination,[10] as the Taxpayers did here.  There are two somewhat separate questions involved in accounting cases: Did a taxpayer's method of accounting clearly reflect income, and, if not, did

---

[8] *See* 26 U.S.C. § 446(a), (c); 26 C.F.R. § 1.446-1(a)(2).

[9] 26 U.S.C. § 446(b).

[10] 26 U.S.C. §§ 6213(a), 6226(a).

the Commissioner choose a method that did? The Taxpayers assert—and the Commissioner does not argue otherwise—that a taxpayer can prevail in the Tax Court by "show[ing] either that its accounting method resulted in a clear reflection of income or that the Commissioner's method does not." *Dayton Hudson Corp. & Subsidiaries v. Comm'r*, 153 F.3d 660, 664 (8th Cir. 1998); *see also* 26 U.S.C. § 446(b); *Lucas v. Ox Fibre Brush Co.*, 281 U.S. 115, 120, 50 S. Ct. 273, 274–75, 74 L. Ed. 733 (1930); *Harden v. Comm'r*, 223 F.2d 418, 421 (10th Cir. 1955); *Prabel v. Comm'r*, 91 T.C. 1101, 1112–13 (1988).

Here the Commissioner continues to claim that the Taxpayers' method does not clearly reflect income, and asserts that we should review that as a mixed question of fact and law. We do not agree. No doubt there are times when the issue is one where the facts are undisputed and only what amount to legal consequences are involved. *See Suzy's Zoo*, 273 F.3d at 878. Before the Tax Court, the Commissioner argued that the issue presented was "a question of fact to be determined on a case-by-case basis." He agreed that the Tax Court principally had to decide what the subject matter of the Taxpayers' home construction contracts was as a matter of fact—that is, what were the Taxpayers obligated to provide to the buyers. *See Sparkman v. Comm'r*, 509 F.3d 1149, 1157 (9th Cir. 2007); *see also Smith v. Comm'r*, 300 F.3d 1023, 1028 (9th Cir. 2002). Thus, his argument amounted to a dispute about the subject matter content of the contracts, but the Commissioner took the very crabbed view that the subject matter was limited to the house and the lot.[11] However, the Tax Court determined that, as a matter of fact, the subject matter included the house, the lot, "the development . . . and

---

[11] He now concedes that his limited view was in error.

its common improvements and amenities." *Shea Homes*, 142 T.C. at 109; *see also Pullman-Standard v. Swint*, 456 U.S. 273, 287–88, 102 S. Ct. 1781, 1789–90, 72 L. Ed. 2d 66 (1982). We review those underlying factual determinations for clear error, which means that "we may reverse the Tax Court only if we have a 'definite and firm conviction' that the tax court's factual finding was wrong." *Meruelo*, 691 F.3d at 1114. And, "[t]o have a definite and firm conviction that the Tax Court erred, we must find that the Tax Court's conclusion was '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Id.*; *see also DJB Holding Corp. v. Comm'r*, 803 F.3d 1014, 1022 (9th Cir. 2015). In this case, we cannot make those determinations. On the contrary, the evidence is sufficient to support the Tax Court's factual determinations.

The Tax Court found that the subject matter of the contracts between the buyers and the Taxpayers encompassed more than the mere "'bricks and sticks'"[12] of the homes; the buyers were purchasing "the entire lifestyle of the development"[13] fostered by the carrying out of the promises regarding what the development would be, and the Taxpayers incurred costs and obligations accordingly.[14] Those are reflected in, among other things, common improvements, bonding requirements, the creation of homeowners' associations in which each buyer had rights, and in the covenants, conditions and restrictions ("CC&R's") that ran

---

[12] *Shea Homes*, 142 T.C. at 90.

[13] *Id.* at 95; *see also id.* at 90–91.

[14] *Id.* at 91–92.

with the land and affected not only the buyer but also other prospective buyers and the properties they were purchasing. This was not a simple case of buyers purchasing homes and having no substantial interest in whether the development would be and remain the kind of development that they wished to live in for some time in the future. It was not like a situation where a person bought a product but had no interest in other products sold by the same seller to other purchasers. Nor could the Taxpayers assume that they could sell other houses in the development without considering the promises made to the initial buyers regarding what the overall development would be like. The Taxpayers' promises gave buyers justifiable expectations regarding what would be promised to those who came later. In other words: "If a purchaser did not want to live in one of the planned developments with its accompanying amenities, it is likely he or she could have paid much less for an otherwise comparable dwelling outside of a development and with no seller-provided amenities." *Shea Homes*, 142 T.C. at 91 (footnote omitted). The Tax Court's determinations were not clearly erroneous.

The Commissioner complains that the Tax Court focused on the house, lot and common amenities in its opinion. The Commissioner then suggests that when the Tax Court mentioned the development as a whole, it was, somehow, being inconsistent. The Commissioner overlooks the fact that *his* focus was on those specific aspects, and those are what he specifically pointed to when he was stating his position for purposes of the trial of this case at the Tax Court. We suspect that the Commissioner was satisfied that his position on those points would win the day and, therefore, that he need not concentrate his firepower on the overall planned community

development aspect of the contracts. The resulting outcome was due to his misperception rather than a Tax Court mistake.

The Commissioner also argues that a buyer of a house cannot himself use other homes and, therefore, the development as a whole could not be part of the subject matter of the buyer's contract. That not only begs the question but also is a non sequitur. Each person in the planned community would, indeed, have an interest in the use of other property in the development, and that would include not only the common amenities but also the use that others in the development made of their own properties. That is at least one reason for the CC&R's and the mandated homeowners' associations. It is not a question of living in another's home; it is a question of assuring that the planned lifestyle is followed to some degree. And until the Taxpayers' work was complete, they had an obligation to fulfill their promises regarding the development that they had induced the buyers to become a part of.

To the extent that the Commissioner asserts that the Tax Court has approved of an aggregation of contracts by the Taxpayers, he does not elaborate or precisely illuminate what he means. We assume he means that the question of whether a contract with a buyer is complete refers to that contract alone, and cannot be combined with other contracts in deciding the question of individual contract completion. *Cf.* 26 U.S.C. § 460(f)(3); 26 C.F.R. § 1.460-1(e). If so, as applied to the facts of this case, that argument is simply another allotrope of the Commissioner's argument to the Tax Court that a buyer's contract cannot encompass more than the house and lot or, as a fall-back position, more than the house, the lot, and the common improvements. It likewise fails. "[The Taxpayers] did not aggregate contracts. Rather, they

tested completion dates of individual contracts using . . . the subject matter of those contracts." *Shea Homes*, 142 T.C. at 104. As the Tax Court further noted, in answer to the Commissioner's jeremiad about that outcome: "Here, the subject matter of [the Taxpayers'] contracts includes the development. In a different case, under different facts, similar treatment of an unreasonably long-term development may in essence be an aggregation."[15] *Id.* at 109 n.23; *see also id.* n.24.

In other words, the Tax Court did not clearly err when it determined the subject matter of the Taxpayers' home construction contracts; the Taxpayers' application of the 95 percent test and the CCM logically flows from that determination. That being so, we need not and do not consider whether the Commissioner's methods could clearly reflect income, although we note that the Commissioner himself has abandoned those specific methods on appeal.[16]

---

[15] The Commissioner argues that Congress did not intend that the 95 percent test would apply as it was applied here. He cites no authority for that proposition. Indeed, he points to a lack of legislative history on the point. At root, the Commissioner's congressional intent point is yet another variant of his argument at the Tax Court that only an individual house and lot could be considered, despite the fact that the contract with the buyer encompassed much more. The Tax Court noted that to the extent legislative history existed, it pointed to Congress' special concerns about homebuilders. *See Shea Homes*, 142 T.C. at 101 n.19. As the Tax Court pointed out, Congress' concern stemmed from builders' need to better match income to expenses. *Id.* That is, Congress wanted to help them clearly reflect their income. In fine, the Commissioner's allusion to congressional intent does not buttress his argument.

[16] The Commissioner now asks that we remand the case so that he can offer an approach that would undermine the Tax Court's ultimate decision and demonstrate that there are deficiencies and required adjustments after

CONCLUSION

The Commissioner assessed deficiencies or adjustments against the Taxpayers. They sought relief in the Tax Court, which ruled in their favor. We affirm the Tax Court's decision that on the record before it, the Taxpayers "used a permissible method of accounting" and "that method of accounting clearly reflect[ed] [their] income." *Shea Homes*, 42 T.C. at 106; *see also id.* at 106–09. In short, they were "permitted to report income and loss from the sales of homes in their planned developments using the completed contract method of accounting" in the manner "consistent with [its] Opinion." *Id.* at 109. Perhaps the Commissioner wishes that he had approached the proceeding before the Tax Court in a different way. In any event, he asks for relief. We have none to offer; he must thole the result. Nevertheless, we would be remiss if we did not close this opinion with the Tax Court's admonition: "We are cognizant that our Opinion today could lead taxpayers to believe that large developments may qualify for extremely long, almost unlimited deferral periods. We would caution those taxpayers a determination of the subject

---

all. We decline to do so because we do not find exceptional circumstances that would justify allowing the case to proceed on the basis of a new factual theory not actually properly presented to the Tax Court. *See Armstrong v. Brown*, 768 F.3d 975, 982 (9th Cir. 2014); *cf. Hormel v. Helvering*, 312 U.S. 552, 556–57, 61 S. Ct. 719, 721, 85 L. Ed. 1037 (1941); *El Paso v. Am. W. Airlines, Inc. (In re Am. W. Airlines, Inc.)*, 217 F.3d 1161, 1165 (9th Cir. 2000). We see no reason to accede to the Commissioner's desire to attempt to prevail by retrying this case based on a new methodological approach. *See Riggs v. Prober & Raphael*, 681 F.3d 1097, 1104 (9th Cir. 2012).

matter of the contract is based on all the facts and circumstances." *Id.* at 109 n.24.

**AFFIRMED.**

RAWLINSON, Circuit Judge, concurring in the judgment:

I concur in the judgment affirming the decision of the Tax Court. However, I do so solely on the basis that the Commissioner of the Internal Revenue Service (Commissioner) is bound by the arguments and theories relied upon during the trial before the Tax Court. As noted by the majority, the Commissioner advocated before the Tax Court that, for purposes of determining the taxable income from the home construction contracts at issue, the subject matter of the construction contract was only the purchased house and the lot upon which the house was sited. Specifically, the Commissioner argued that none of the amenities included in the housing development were part of the contract, and that any amenities were secondary items unrelated to completion of the contract.

The Tax Court rejected the Commissioner's argument on both fronts, ruling that each construction contract included the amenities within the development, and that those amenities were not secondary items. On appeal, the Commissioner does not challenge these rulings by the Tax Court. Rather, the Commissioner now seeks to argue that the Tax Court erroneously permitted the Taxpayers to include the entire development when performing the calculation under the 95 percent completion test.

Our precedent is replete with cases precluding a party from endeavoring to assert a theory on appeal that was not presented to the trial court. *See, e.g.*, *Stewart v. Comm'r of Internal Revenue*, 714 F.2d 977, 986 (9th Cir. 1983) ("Without question, the most appropriate times for the Commissioner to inform a taxpayer of the legal theories on which he intends to rely are first in the notice of deficiency and then in the Commissioner's answer in the Tax Court. . . .") ( citation omitted); *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 511 (9th Cir. 2013) ("The Court will not allow a party to raise an issue for the first time on appeal merely because a party believes that he might prevail if given the opportunity to try a case again on a different theory.") (citation and alteration omitted); *Tibble v. Edison Int'l.*, 820 F.3d 1041, 1046 (9th Cir. 2016) ("We recognize a general rule against entertaining arguments on appeal that were not presented or developed before the district court. . . . [A]n issue will generally be deemed waived on appeal if the argument was not raised sufficiently for the trial court to rule on it.") (citations and internal quotation marks omitted).

We need go no further than consulting this precedent to resolve the instant appeal. I would not, and do not, go so far as to adopt the Taxpayers' contention that the subject of each construction contract is the entire development. For starters, the concept of the contract encompassing all of the homes in the development ignores the singular language of the governing regulation, which references "*the* subject matter of the contract." 26 C.F.R. §1.460-4(d)(1) (emphasis added). It is undisputed that each home purchaser signs an individual contract and becomes obligated for the purchase price of the home at the time the individual contract is signed. Yet, the Taxpayers argued that until the cost of 95 percent of the

entire development has been incurred, no reportable income has been realized.  The Tax Court appeared to recognize the fallacy in this contention as a general premise, noting that it would be improper to apply the 95 percent completion test "by comparing the number of homes closed in escrow in the development to the number of homes projected to be built in the development."  Nevertheless, the fact remains that a Taxpayer could readily manipulate the 95 percent completion test by deliberately incurring development costs of less than 95 percent and deferring the balance of the costs indefinitely, correspondingly deferring taxes indefinitely.  I am not persuaded that this interpretation of the regulation is consistent with its plain language.  For that reason, I would affirm the Tax Court's decision solely on the basis that the Commissioner failed to raise this issue sufficiently for the Tax Court to rule on it.  I would reserve resolution of this important issue for a case where it was fairly joined.